[No. F059153. Fifth Dist. Sept. 13, 2011.]

MADERA OVERSIGHT COALITION, INC., et al., Plaintiffs and Appellants, v.
COUNTY OF MADERA, Defendant and Appellant;
TESORO VIEJO, INC., et al., Real Parties in Interest and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I.C.3., I.D.6., I.D.7., III.C.6., III.D., III.E., IV.B., V. and VII. of the Discussion.

52

**COUNSEL**

Sara Hedgpeth-Harris; and Patience Milrod for Plaintiffs and Appellants.

David A. Prentice and Douglas W. Nelson for Defendant and Appellant.

Sanger & Olson, John M. Sanger and Charles R. Nelson for Real Parties in Interest and Appellants.

OPINION

DAWSON, J.—This is the second appeal involving a petition for writ of mandamus challenging the County of Madera's (County) approval of the Tesoro Viejo mixed-use development project. (See *Chawanakee Unified School Dist. v. County of Madera* (2011) 196 Cal.App.4th 1016 [126 Cal.Rptr.3d 859] [matter remanded for issuance of writ directing County to analyze certain impacts related to traffic and construction].) Here, the trial court granted a petition for writ of mandamus on the ground that the discussion in the environmental impact report (EIR) concerning the project's water supply was inadequate and, as a result, violated the California Environmental Quality Act (CEQA).[1]

Plaintiffs appealed, contending the EIR's discussion of historical resources of an archaeological nature, traffic impacts, and cumulative impacts also violated CEQA. Defendants cross-appealed, contending the discussion of water supply in the EIR was adequate and a writ of mandate should not have been issued. The substantive disputes between the parties involve various questions concerning the scope of the administrative record and the admission of extra-record evidence.

We reach the following conclusions. First, the trial court did not err in applying section 21167.6, subdivision (e) and determining which documents to include and exclude from the administrative record. Second, the mitigation measure that proposes to verify that certain archaeological sites are historical resources for purposes of CEQA constitutes an unlawful deferral of environmental analysis. Third, the EIR's traffic analysis lacks clarity regarding the baseline used to determine the project's potential impacts. Fourth, the discussion of cumulative impacts was legally inadequate because it failed to disclose and explain the basis for assuming a 30 percent buildout in the area by 2025. Fifth, the trial court correctly determined that the analysis of the project's proposed water supply was inadequate for purposes of CEQA. Finally, the trial court did not err in apportioning costs.

The judgment will be affirmed in part and reversed in part.

## FACTS

Plaintiffs in this proceeding are (1) Madera Oversight Coalition, Inc., a California nonprofit corporation that alleges its members are residents of Madera County committed to preventing further environmental damage,

---

[1] Public Resources Code section 21000 et seq. All further statutory references are to the Public Resources Code unless otherwise indicated.

(2) Revive the San Joaquin, Inc., a California corporation that describes itself as a grassroots nonprofit organization, qualified under section 501(c)(3) of the Internal Revenue Code (26 U.S.C. § 501(c)(3)), working to restore and sustain a healthy San Joaquin River, and (3) the Dumna Tribal Council, the governing body of the Dumna Tribe, a sovereign entity.

The defendant and real parties in interest in this matter are (1) County, (2) Tesoro Viejo, Inc., (3) Rio Mesa Holdings, LLC, and (4) Tesoro Viejo Master Mutual Water Company (collectively, defendants). Plaintiffs allege that Tesoro Viejo, Inc., and Rio Mesa Holdings, LLC, are the proponents of the development project and that they own, or hold a beneficial interest in, the land within the project.

The Tesoro Viejo project involves the development of 1,579 acres located in southeastern Madera County. The project site is between the San Joaquin River on the east and State Route 41 on the west and north of Coombs Ranch. It is within an area known as Rio Mesa and is subject to the Rio Mesa Area Plan, which County adopted in 1995.

The project proposes a mix of residential, commercial, and light industrial uses plus areas for open space, recreation, and other public uses. The project would contain up to 5,190 dwelling units and about three million square feet for commercial, retail, office, public institutional, and light industrial uses.

In February 2006, Tesoro Viejo, Inc., requested that County initiate the environmental review process for the proposed development.

County issued a notice of preparation of a draft EIR for the Tesoro Viejo project in November 2006 and set an environmental scoping meeting for December 14, 2006.

In February 2008, County published a notice stating that a draft EIR for the Tesoro Viejo project was available for public review and comment. Responses to comments received were included in the final EIR.

On September 23, 2008, County's planning commission held a public hearing and passed a motion that recommended the board of supervisors certify the final EIR.

On December 8, 2008, County's board of supervisors held a public meeting to consider approving the final EIR, the specific plan and related rezoning, an infrastructure master plan, a water supply assessment, and a development agreement, all of which concerned the Tesoro Viejo project. At that meeting, the board of supervisors unanimously certified the final EIR. It

also approved an ordinance adopting the Tesoro Viejo specific plan and the related comprehensive rezoning of the property within the plan boundaries. The notice of determination for the project was filed the next day.

## PROCEEDINGS

On January 7, 2009, plaintiffs filed a petition for writ of mandamus and complaint for declaratory and injunctive relief. They alleged three causes of action that are pertinent to this appeal and cross-appeal for (1) violations of CEQA, (2) violations of the Planning and Zoning Law (Gov. Code, § 65000 et seq.), and (3) violations of the Water Code. Two other causes of action are not pertinent here.[2]

County lodged and certified the administrative record in mid-May 2009. Along with their briefing, plaintiffs thrice requested augmentation of the administrative record.

The hearing on substantive issues occurred on September 8, 2009. At the close of the hearing, the trial court stated its conclusion that the EIR, as an informational document, was inadequate because it did not discuss issues that caused uncertainty regarding the water supply for the project. The court stated it would order decertification of the EIR and would direct County to vacate any entitlements approved on the basis of the EIR.

The trial court filed its written decision, which included an order granting in part the motions to augment the administrative record, on October 26, 2009. The judgment granted in part and denied in part the petition for writ of mandamus. It included the following determination: "County as lead agency abused its discretion by failing to proceed as required by CEQA, in that the Project EIR failed to disclose, discuss or analyze uncertainties surrounding the proposed use of Holding Contract No. 7 as the Project's source of water, and likewise failed to address alternative water sources which might supply water to the project if Holding Contract water were not available, as well as the environmental impacts of using such alternative sources."

The judgment also stated that any claim for an award of costs or attorney fees would be determined by the trial court upon a separate posttrial motion.

On the same day that the trial court filed its judgment, it also filed a peremptory writ of mandate directing County and its board of supervisors

---

[2] A cause of action alleging a pattern and practice by County, of inadequately evaluating cumulative impacts, was severed and given a new filing number. A demurrer was sustained as to the fifth cause of action, alleging a violation of the general plan and Government Code section 65352.3.

(1) to set aside the certification of the EIR and all related entitlements, and (2) upon taking final action on the project, to file a return with the court setting forth what it had done to comply with the writ.

Plaintiffs filed a notice of appeal relating to the trial court's judgment denying parts of the petition for writ of mandate. Defendants filed a cross-appeal relating to that portion of the judgment that (1) granted plaintiffs' motion to augment the record as to six documents and (2) granted plaintiffs' petition for writ of mandamus as to the issue of water supply.

In February 2010, the trial court awarded attorney fees to plaintiffs in the amount of approximately $277,000. The award of attorney fees is the subject of a separate appeal (*Madera Oversight Coalition, Inc. v. County of Madera* (Sept. 14, 2011, F059857) [nonpub. opn.]).

## DISCUSSION

### I. *Scope of the Administrative Record*

The parties have raised a number of questions regarding the scope of the record in this case. These questions involve both rulings made by the trial court and motions to augment the record filed in this court.

We publish this part of the opinion because some of the positions taken by the parties demonstrate confusion concerning how to preserve and present evidentiary issues in a CEQA appeal.[3] We provide guidance to practitioners in subsequent cases so that they will proceed more efficiently in the expenditure of their own time and that of the courts.[4]

---

[3] For example, plaintiffs request that this court augment the record with documents that the trial court already ordered be included in the administrative record. (See pt. I.D.1., *post.*)

[4] In our analysis, when not quoting a statute, we adopt the commonly used term "administrative record" rather than the statutory term "record of proceedings" used in subdivisions (b)(1) and (e) of section 21167.6. (Cf. *Wagner Farms, Inc. v. Modesto Irrigation Dist.* (2006) 145 Cal.App.4th 765, 767, fn. 2 [52 Cal.Rptr.3d 683] [the term "record of proceedings" used in opinion concerning the cost of its preparation].) We use the term "administrative record" even though the present proceeding is not one for *administrative* mandamus and Code of Civil Procedure section 1094.5 is inapplicable. (See pt. II., *post.*) The distinction between administrative and traditional mandamus has practical significance in this appeal because the rules regarding the admission of extra-record evidence are different. A statute addresses the admission of evidence in an administrative mandamus proceeding. (Code Civ. Proc., § 1094.5, subd. (e).) In contrast, the rules regarding the admission of extra-record evidence in a CEQA matter involving ordinary mandamus are judicially made, and the foundation for those rules was established by the California Supreme Court in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559 [38 Cal.Rptr.2d 139, 888 P.2d 1268] (*Western States*).

Care must be taken to distinguish the administrative record (i.e., the "record of proceedings") from the record on appeal (see Cal. Rules of Court, rule 8.120 et seq.) because

## A. *Rules Concerning the Scope of the Administrative Record*

█ Our discussion of the rules of law concerning administrative records begins with clarifying the relationship between the administrative record and other types of evidence. Specifically, there are two distinct ways to place evidence before the superior court in a CEQA matter: The evidence can be (1) included in the *administrative record* pursuant to the provisions of subdivision (e) of section 21167.6 or (2) admitted as *extra-record evidence.* (See *Western States, supra,* 9 Cal.4th 559 [admission of extra-record evidence in a CEQA proceeding involving traditional mandamus].) Extra-record evidence, of course, is "evidence outside the administrative record." (*Carrancho v. California Air Resources Board* (2003) 111 Cal.App.4th 1255, 1269 [4 Cal.Rptr.3d 536].)

The distinction between materials properly included in the administrative record and materials presented as extra-record evidence is described here because the papers submitted by the parties have not always treated the two categories of evidence as distinct concepts that involve different tests for admissibility. As a general proposition, the proper method of analysis for determining whether a particular item should be considered as evidence in a CEQA matter is to determine first whether the item is part of the administrative record pursuant to subdivision (e) of section 21167.6. If the item does not qualify for inclusion in the administrative record, then its admissibility can be determined under the rules applicable to extra-record evidence. (*Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 366–367 [54 Cal.Rptr.3d 485].)

In this part of this opinion, we are concerned primarily with the first inquiry regarding the proper scope of the administrative record.

### 1. *Provisions governing the creation of the administrative record*

█ The three initial steps involving the administrative record in a CEQA case—preparing, certifying and lodging—are addressed in section 21167.6, subdivision (b). That provision states that the administrative record may be prepared by the public agency, the plaintiff, or an alternate method agreed upon by the parties. Regardless of which method is chosen, the administrative record is "subject to certification of its accuracy by the public agency . . . ." (§ 21167.6, subd. (b)(2).) When the public agency prepares the administrative record, the agency is required to lodge a copy of it with the court upon certification. (*Id.,* subd. (b)(1).)

---

augmenting the record on appeal does not necessarily mean the document will be regarded as part of the administrative record or is otherwise admissible.

These three steps were followed in this case—County prepared, certified and lodged the administrative record with the trial court.

### 2. *Trial court's authority regarding disputes over the record*

■ After an administrative record is certified and lodged, disputes over its contents at times arise. For example, here plaintiffs contend the agency omitted documents that should have been included. (See pt. I.B.2., *post.*) Neither CEQA nor the Guidelines[5] specify the procedures parties should follow in presenting these disputes. It is clear, nonetheless, that the Legislature anticipated that such disputes would arise. The CEQA provision that establishes the briefing schedule permits the trial court to extend the schedule for "good cause," which includes the "determination of the completeness" of the administrative record. (§ 21167.4, subd. (c); see also *Leavitt v. County of Madera* (2004) 123 Cal.App.4th 1502, 1525 [22 Cal.Rptr.3d 101].)

Though the statute does not identify who makes the "determination of the completeness" of the administrative record, we interpret the statutory phrase to include the action taken by the trial court to resolve disputes between the parties over what should be included in, or excluded from, the administrative record. This interpretation necessarily implies that trial courts have the authority to resolve those disputes. (See *Mejia v. City of Los Angeles* (2005) 130 Cal.App.4th 322, 335–336 [29 Cal.Rptr.3d 788] [trial court construed plaintiff's request for judicial notice as motion to supplement administrative record under local rule and granted motion as to two documents].)

### 3. *Rules of law that specify the contents of the administrative record*

The contents of the administrative record are governed by subdivision (e) of section 21167.6, which begins: "The record of proceedings shall include, but is not limited to, all of the following items . . . ." Subdivision (e) then enumerates 11 categories of material that must be included in the administrative record. We have not set forth the text of those 11 categories because most are not relevant to the disputes raised in this appeal.

■ The quoted statutory language is relevant to establishing the legal context for this appeal. First, the language is mandatory—*all* items described in any of the enumerated categories *shall* be included in the administrative record. (§ 15 [" 'Shall' is mandatory . . . ."].) Second, the statutory phrase

---

[5] "Guidelines" refers to the regulations codified in title 14, section 15000 et seq. of the California Code of Regulations, which have been "prescribed by the Secretary for Resources to be followed by all state and local agencies in California in the implementation of [CEQA]." (Guidelines, § 15000.)

"include, but is not limited to" indicates the extensive list provided in the statute is *not exclusive.* "It has been observed that this section 'contemplates that the administrative record will include pretty much everything that ever came near a proposed development or to the agency's compliance with CEQA in responding to that development.' (*County of Orange v. Superior Court* (2003) 113 Cal.App.4th 1, 8 [6 Cal.Rptr.3d 286], italics omitted . . . .)" (*Eureka Citizens for Responsible Government v. City of Eureka, supra,* 147 Cal.App.4th at pp. 366–367.)

### 4. *Reviewability of trial court's determinations*

Once a trial court has determined to include or exclude a document from the administrative record pursuant to subdivision (e) of section 21167.6, the question becomes how the appellate court should treat that determination. One possibility is for the appellate court simply to ignore the trial court's determination and independently decide whether the administrative record should include or exclude that document. This is the position taken by plaintiffs and, though less clearly, by defendants in this case. Another approach—the one that we will adopt—is for the appellate court to review the trial court's determination as it would review procedural or evidentiary determinations in other civil cases.

### a. *Trial court determinations are reviewable*

In deciding whether this court should make an independent decision regarding the scope of the administrative record or review the trial court's determination, we consider the nature of the determinations made by (1) the agency in preparing and certifying the administrative record and (2) the trial court in applying section 21167.6, subdivision (e) to the disputes before it.

When an agency prepares and certifies the administrative record, it exercises no discretion and employs no specialized expertise; it performs a ministerial task when it applies the mandatory language in section 21167.6, subdivision (e). (See *County of Orange v. Superior Court, supra,* 113 Cal.App.4th at p. 11 [compilation of administrative record is ministerial task].) Ordinarily, when an agency performs a ministerial task, deferential judicial review is not appropriate. (See *Western States, supra,* 9 Cal.4th at p. 576 [ministerial actions by an agency do not merit deference].) As a result, when a trial court applies section 21167.6, subdivision (e) and determines the contents of the administrative record, it does so in its role as a trier of fact, not a court of review, and it resolves the factual and legal disputes between the parties without deference to the agency's certification. (See *Western States, supra,* at p. 576 [independent judicial scrutiny appropriate when actions are ministerial].)

Based on the respective roles of the agency and the trial court in applying section 21167.6, subdivision (e), we conclude that it is the trial court's determinations regarding the scope of the administrative record that are reviewable by the appellate court. Appellate courts do not review the agency's decision about what to include in the administrative record.

The foregoing discussion breaks new ground only by being explicit in its reasoning and conclusions. The ultimate conclusion that an appellate court reviews the trial court's determinations regarding the scope of the administrative record is not new. Such a review has occurred in other published decisions. (E.g., *Eureka Citizens for Responsible Government v. City of Eureka, supra,* 147 Cal.App.4th 357 [appellate court found no error in trial court's denial of motion to augment administrative record]; *Mejia v. City of Los Angeles, supra,* 130 Cal.App.4th 322 [trial court granted motion to supplement administrative record as to two documents, but should have granted motion as to other documents as well]; *County of Orange v. Superior Court, supra,* 113 Cal.App.4th 1 [peremptory writ directed trial court to include certain documents in administrative record].) The approach adopted by the parties is contrary to the foregoing cases. Furthermore, they have cited no case in which an appellate court determined that it would review the agency's certification of the administrative record rather than the trial court's determinations regarding the scope of the administrative record.

b. *Standard of review applicable to trial court's decision*

We review a trial court's determination to include or exclude a document from the administrative record pursuant to the mandatory language of subdivision (e) of section 21167.6 by applying the following ordinary principles of appellate practice.[6]

The trial court's findings of fact are reviewed under the substantial evidence standard. (See, e.g., *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1143 [86 Cal.Rptr.2d 816, 980 P.2d 371] [appellate court must accept trial court's findings of fact supported by substantial evidence].) The trial court's conclusions of law are subject to independent review on appeal. (See *Ghirardo v. Antonioli* (1994) 8

---

[6] We explicitly note that we are not deciding what standard of review applies to a trial court's determination that goes beyond the 11 mandatory categories and includes a document in the administrative record based on the language that the administrative record "shall include, but is not limited to" the 11 categories. (§ 21167.6, subd. (e).) Specifically, we do not decide whether the language of nonexclusivity grants discretionary authority to the trial court that is subject to review under the abuse of discretion standard. (*Department of Parks & Recreation v. State Personnel Bd.* (1991) 233 Cal.App.3d 813, 831 [284 Cal.Rptr. 839] [an "abuse of discretion standard . . . measures whether, given the established evidence, the act of the lower tribunal falls within the permissible range of options set by the legal criteria"].)

Cal.4th 791, 801 [35 Cal.Rptr.2d 418, 883 P.2d 960] [questions of law are subject to independent review].)

In addition to the foregoing standards of review, appellate review of a trial court's determinations regarding the scope of the administrative record is subject to the principle that appellate courts presume the trial court's order is correct. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193].) This presumption produces the corollaries that (1) an appellant must affirmatively demonstrate an error occurred and (2) when the appellate record is silent on a matter, the reviewing court must indulge all intendments and presumptions that support the order or judgment. (*Ibid.*) The intendments and presumptions indulged by the appellate court include inferring the trial court made implied findings of fact that are consistent with its order, provided such implied findings are supported by substantial evidence. (See *Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 745 [106 Cal.Rptr.3d 318] [implied finding inferred by appellate court only if supported by substantial evidence].)

B. *Proceedings in the Trial Court Regarding the Administrative Record*

1. *Lodging of the administrative record*

The trial court here first addressed the administrative record when it established a schedule for the litigation in its May 21, 2009, order after case management conference. The order directed County to lodge and certify the administrative record no later than June 8, 2009. It also stated that disputes regarding the contents of the record that could not be resolved informally were to be raised with the court no later than the date the parties' respective briefs were due. The certified administrative record was lodged with the court on May 20, 2009.

2. *Disputes presented to the trial court*

In early July 2009, when plaintiffs filed their brief on the merits, they also filed a notice of motion to augment the administrative record and for judicial notice concerning 15 documents. The following documents were among the 15 presented:

(1) the June 29, 2006, decision in *Madera County Farm Bureau v. Madera County Board of Supervisors* (Super. Ct. Stanislaus County, No. 350927) (*Farm Bureau* decision),

(2) a letter dated April 13, 2007, from Michael P. Jackson, United States Bureau of Reclamation, to Attorney Warren P. Felger (Jackson letter),

(3) permits Nos. 11885, 11886 and 11887 from the State Water Resources Control Board (SWRCB),

(4) State Water Rights Board[7] decision No. D935 dated June 2, 1959,

(5) pages 118 and 119 of a transcript of the June 9, 2009, hearing of County's board of supervisors,

(6) the "Baloian Study,"[8]

(7) a comment letter dated March 28, 2008, from Mary Clark Baloian of Applied EarthWorks, Inc., to Matthew Treber, a planner with County's resource management agency, regarding the discussion in section 4.5 of the draft EIR of archaeological sites (Baloian comment letter), and

(8) a letter dated December 2, 2008, from Michael Navarro, California's Department of Transportation (CalTrans), to Jerald James, Madera County Planning Director (CalTrans letter).

The motion asserted that the materials were relevant to show County failed to proceed in the manner required by law and to prove County's misconduct. Plaintiffs argued the materials (1) should have been included in the administrative record pursuant to section 21167.6, (2) were subject to judicial notice, or (3) both.

Subsequently, plaintiffs filed two supplements to their motion to augment the record. The first was filed five days after the original motion. It concerned a comment letter from plaintiffs' attorney to the board of supervisors of County, which letter had been submitted at the board's December 8, 2008, hearing. The second supplement was filed on September 1, 2009, and concerned an additional 12 documents, many of which were dated *after* the prior supplement had been filed. The documents included a 61-page development agreement between County and Tesoro Viejo, Inc., dated June 9, 2009, concerning the Tesoro Viejo project (Development Agreement), and correspondence and materials from July and August related to the agreement.

---

[7] This was the board's name in 1959. It is now the State Water Resources Control Board.

[8] The "Baloian Study" refers to the report prepared by Applied EarthWorks, Inc., and titled "Cultural Resources Survey and Evaluation on the Sumner Peck Ranch for the Tesoro Viejo Project, Madera County, California." It was authored by Mary Clark Baloian, Randy M. Baloian, Michael J. Moratto, and Barry A. Price and dated April 2006. Three of the authors are registered professional archaeologists and Mary Clark Baloian and Michael J. Moratto hold Ph.D.'s in anthropology.

County excluded the Baloian Study from the draft EIR to protect sensitive information about the location and extent of cultural resources located at the project site. The Baloian Study was filed with the trial court under seal and is part of the appellate record.

Defendants filed an opposition to plaintiffs' motion to augment the administrative record and for judicial notice. Their opposition stated they did not oppose the inclusion in the administrative record of (1) the two pages of transcript from the board of supervisors' June 9, 2009, hearing, (2) the Baloian Study, which had been filed with the court under seal, and (3) the CalTrans letter dated December 2, 2008. Defendants asserted the other documents were irrelevant and inadmissible extra-record evidence that should be excluded pursuant to *Western States, supra,* 9 Cal.4th 559.

Defendants also opposed plaintiffs' second supplement to the motion to augment the administrative record. They argued the second supplement was untimely, violated the court's scheduling order, and sought to introduce irrelevant and inadmissible evidence. Among other things, defendants argued that plaintiffs' opening brief had not challenged the Development Agreement and, therefore, the agreement and related documents were irrelevant to the claims set forth in plaintiffs' writ petition.

### 3. *The trial court's rulings*

The trial court's written decision, filed on October 26, 2009, included an order granting in part plaintiffs' motions to augment the administrative record. The court granted their motion to augment with respect to the three items that defendants did not oppose—namely, the two pages of transcript from the board of supervisors' June 9, 2009, hearing, the Baloian Study, and the CalTrans letter dated December 2, 2008. The court also granted their motion as to the *Farm Bureau* decision, the Jackson letter, and the December 8, 2008, comment letter from plaintiffs' attorney. The court denied the remainder of plaintiffs' requests, including the request concerning the Baloian comment letter.

### C. *Matters Raised on Appeal Concerning the Record*

### 1. *June 30, 2010, motion to augment*

On June 30, 2010, plaintiffs filed a motion in this court to augment the record with nine documents. Each of the documents, except notes from the September 14, 2006, Tesoro Viejo project kickoff meeting, were in the clerk's transcript on appeal and thus already a part of the appellate record. On July 8, 2010, this court filed an order denying the motion to augment without prejudice and stating that eight of the documents were in the clerk's transcript.

### 2. *November 8, 2010, motion to augment*

On November 8, 2010, plaintiffs filed another motion here to augment the record. This motion concerned seven documents—the first seven documents

referenced in the plaintiffs' motion to augment the administrative record filed in the trial court in July 2009. As with their June motion to augment filed in this court, plaintiffs cited to the pages of the clerk's transcript where the seven documents were located.

Three of the seven documents that are the subject of plaintiffs' November 8, 2010, motion to augment were made part of the administrative record as a result of the trial court's October 26, 2009, order. (See pt. I.B.3., *ante.*) Those three documents are the *Farm Bureau* decision, the Jackson letter, and two pages of transcript from the June 9, 2009, meeting of the board of supervisors.

The other four documents included in plaintiffs' November 8, 2010, motion to augment are SWRCB permits Nos. 11885, 11886 and 11887, and State Water Rights Board decision No. D935 dated June 2, 1959,[9] which the trial court decided not to include in the administrative record.

On December 6, 2010, this court ordered that the appellate record be augmented with the seven documents referenced in plaintiffs' November 8, 2010, motion. The order also stated that this court was not determining whether the materials were relevant or would be considered in this appeal. Our order augmenting the appellate record should not be construed as an order augmenting the *administrative record* or as a ruling on the propriety of the trial court's action in admitting and denying admittance to the seven documents with which the November 8, 2010, motion to augment is concerned.

> 3. *December 27, 2010, motion to augment*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

> 4. *Defendants' March 8, 2011, request for judicial notice*

On March 8, 2011, defendants filed a request for judicial notice concerning (1) a February 24, 2010, letter from the SWRCB to defendants, (2) an SWRCB order dated October 1, 2009, regarding permits Nos. 11885, 11886 and 11887, and (3) excerpts from State Water Rights Board decision No. D935 dated June 2, 1959. Defendants assert that these documents are relevant to their argument that this court should refrain from considering any

---

[9] Paragraph No. 19 of an expert's opinion letter states that ". . . Decision 935 provides the scope of the permissible manner and location of diversions of the water acquired by the United States, and the right to use the [San Joaquin] riverbed as a means of conveying water to those under contract with it."

[*] See footnote, *ante*, page 48.

extra-record evidence at all in ruling on their cross-appeal. Defendants state that the documents "are submitted only to demonstrate the kind of extra-record evidence that the Court would have to entertain if the Court agreed to consider [plaintiffs'] similar extra-record evidence."

### 5. Issues regarding the record raised in plaintiffs' opening brief

In addition to the foregoing motions filed with this court, the parties also raise issues in their appellate briefs regarding the administrative record. In their opening brief, plaintiffs contend that County's removal of the Baloian comment letter from the public record violated Government Code section 6200 and the provisions that define the scope of the administrative record.

Defendants assert that the Baloian comment letter was properly excluded from the administrative record because Applied EarthWorks, Inc., voluntarily withdrew it a few days after Baloian submitted it. Defendants also assert no prejudice occurred from its exclusion because County addressed the concerns raised in the letter elsewhere in its responses to public comments.

### 6. Evidentiary issues raised in defendants' opening brief

By way of their cross-appeal, defendants challenge the trial court's decision that the EIR's discussion of water supply was inadequate. As part of that challenge, defendants contend that the trial court erred in relying on extra-record evidence to find that the EIR was inadequate.

Specifically, defendants reference the trial court's ruling augmenting the administrative record with the *Farm Bureau* decision, the Jackson letter, and the two pages of transcript from the June 9, 2009, hearing of the board of supervisors. They assert that none of these items was part of the record before County at the time of certification of the EIR and that "[t]he trial court improperly relied on such evidence . . . ." Furthermore, they contend, "Such evidence is also not admissible before this Court and, of course, the trial court's decision is not binding on this Court. [Citation.]"

### D. Analysis of Issues Raised in This Court

#### 1. November 8, 2010, motion to augment

The November 8, 2010, motion to augment that plaintiffs filed in this court concerns seven documents. (See pt. I.C.2., *ante.*) The trial court had already ruled on those documents by granting the motion as to three of them and denying it as to the other four. (See pt. I.B.3., *ante.*)

We conclude that this motion is not the proper way to present this court with the issues concerning the inclusion of the seven documents in the administrative record.

First, the motion is superfluous as to the three documents that the trial court ordered to be included in the administrative record. Plaintiffs are entitled to rely on those rulings and need not present the documents anew to this court in a motion to augment.

Second, as to the permits from the SWRCB—Nos. 11885, 11886 and 11887—and State Water Rights Board decision No. D935 dated June 2, 1959, which the trial court refused to include in the administrative record,[10] plaintiffs should have challenged the trial court's refusal as part of their appeal rather than filing with this court a motion to augment. The trial court's determinations regarding the scope of the administrative record are reviewable on appeal (pt. I.A.4.a., *ante*). When a party seeks review of a trial court's determinations regarding the scope of the administrative record, that party bears the burden of demonstrating that the trial court committed error. (See *Eureka Citizens for Responsible Government v. City of Eureka, supra*, 147 Cal.App.4th at pp. 366–367 [appellants failed to establish proffered documents fell within categories where inclusion in administrative record was mandated by § 21167.6, subd. (e); trial court's determinations upheld]; see generally *Denham v. Superior Court, supra*, 2 Cal.3d at p. 564 [appellant must affirmatively demonstrate error occurred because appellate court indulges all intendments and presumptions that support order].)

For the sake of argument, we will construe plaintiffs' November 8, 2010, motion to augment as a direct challenge to the trial court's decision to deny the request to include the three permits and the 1959 order in the administrative record. Plaintiffs' challenge must be rejected because they have failed to establish the trial court erred in excluding the documents. Specifically, plaintiffs' theory for inclusion of the documents was and continues to be based on (1) the factual assertion that the documents were not discovered until after their petition was filed and (2) a declaration from one Preston Van Camp, who describes how he obtained the documents but omits any explanation of the timing of his actions and why his request was not made earlier. We, as the reviewing court, must infer that the trial court was not convinced that plaintiffs acted with reasonable diligence in obtaining the documents. (See *Barthelemy v. Chino Basin Mun. Water Dist.* (1995) 38 Cal.App.4th 1609, 1621 [45 Cal.Rptr.2d 688], citing *Western States, supra*, 9 Cal.4th at p. 578 [reasonable diligence requirement].) Because it is within the province of the trial court, sitting as the trier of fact, to decide factual questions such as

---

[10] The trial court's refusal is set forth in paragraph No. 2 of its judgment and order filed October 26, 2009.

reasonable diligence and the persuasiveness of the evidence presented, we will not second-guess the implied findings made by the trial court. Consequently, plaintiffs have failed to establish their theory of error regarding the trial court's exclusion of the SWRCB permits and State Water Rights Board decision No. D935 dated June 2, 1959, from the administrative record.

Based on the foregoing, we deny the November 8, 2010, motion to augment the record to the extent that it requests this court to include the seven referenced documents in the *administrative* record. Our denial of the motion filed in this court in no way affects the rulings made by the trial court concerning the same documents.

### 2. *Pages from June 9, 2009, transcript*

Defendants contend the trial court erroneously considered pages 118 and 119 of the certified transcript of the June 9, 2009, hearing of the board of supervisors. In the trial court, defendants' written opposition to plaintiffs' motion to augment the administrative record stated that defendants did not oppose the motion with respect to the transcript pages. We conclude that defendants have forfeited their claim that the trial court erred in considering the transcript because of their position taken below. (See 7 Witkin, Cal. Procedure (5th ed. 2008) Trial, § 376, p. 438 [waiver]; *id.*, § 377, p. 439 [invited error].)

Therefore, the two pages of transcript are properly regarded as part of the administrative record in this appeal.

### 3. Farm Bureau *decision*

Defendants contend the trial court erroneously considered the *Farm Bureau* decision. The motion to augment the administrative record that plaintiffs filed in the trial court stated that the *Farm Bureau* decision was being offered to prove County knew "Holding Contract No. 7" did not create a water right from the San Joaquin River and that County should have (1) consulted with the United States Bureau of Reclamation and the SWRCB or (2) required the project proponent to provide further information about its water rights. Plaintiffs cited subdivision (e)(7) and (10) of section 21167.6 as the grounds for including the decision in the administrative record.

Defendants countered plaintiffs' arguments by asserting the *Farm Bureau* decision "is irrelevant because it was not before the Board when the Board considered the Specific Plan. As such, it is extra-record evidence that cannot now be added to the Record. See [*Western States, supra,*] 9 Cal.4th at [pages] 573–574, 576."

We will presume that, in granting the request to add the *Farm Bureau* decision to the administrative record, the trial court found that the decision was "written material[] relevant to the . . . public agency's compliance with [CEQA] . . . ." (§ 21167.6, subd. (e)(10); see *Denham v. Superior Court, supra,* 2 Cal.3d at p. 564 [appellate court indulges all intendments and presumptions that support order].)

In their appellate brief, as they did below, defendants treat the *Farm Bureau* decision as extra-record evidence. This approach is wrong because it fails to give the required deference to the trial court's factual determination that the *Farm Bureau* decision is "written material[] relevant to the . . . public agency's compliance with [CEQA]" and thus is part of the administrative record. (See *Carrancho v. California Air Resources Board, supra,* 111 Cal.App.4th at p. 1269 [defining "extra-record evidence" as evidence outside administrative record].) Thus, defendants have pointed out no potential errors of fact or law made by the court in reaching the determination that the *Farm Bureau* decision was part of the administrative record pursuant to subdivision (e)(10) of section 21167.6. They have not affirmatively demonstrated that the trial court erred. (See *Denham v. Superior Court, supra,* 2 Cal.3d at p. 564 [party challenging ruling must affirmatively demonstrate error occurred].) Therefore, we will treat the *Farm Bureau* decision as part of the administrative record in this case.

4. *Jackson letter dated April 13, 2007*

Defendants also contend that the trial court improperly relied on the Jackson letter. Like the *Farm Bureau* decision, they approach the Jackson letter as though it were extra-record evidence. Again, this approach is inappropriate because the trial court ordered that document to be included in the administrative record.

Plaintiffs argued before the trial court that the Jackson letter was being "offered to prove the County failed to consult with the Bureau about the use of river water for Tesoro Viejo's water supply" and thereby violated the requirement in section 21153 to consult with other agencies. This argument relates to the requirement that the administrative record shall contain "written material[] relevant to the . . . public agency's compliance with [CEQA] . . . ." (§ 21167.6, subd. (e)(10).) We will presume that the trial court determined the Jackson letter should be made part of the administrative record pursuant to that provision.

Because defendants have failed to carry their burden of demonstrating affirmatively that the trial court erred by including the Jackson letter in the administrative record pursuant to subdivision (e)(10) of section 21167.6, we

will uphold the trial court's order regarding the Jackson letter and will regard the letter as part of the administrative record in this case.[11]

### 5. *Baloian comment letter*

#### a. *Background*

Item 10 in plaintiffs' July 8, 2009, motion to augment the administrative record was the Baloian comment letter dated March 28, 2008. A copy of the letter was attached to a June 15, 2009, declaration of plaintiffs' attorney and another copy was attached to the motion to augment. The letter uses Applied EarthWorks, Inc.'s stationery and is signed by Mary Clark Baloian as "Senior Archaeologist[,] Applied EarthWorks, Inc." The first paragraph of the letter states Baloian reviewed section 4.5 of the draft EIR to assess (1) whether it accurately depicts the findings reported in the Baloian Study and (2) "whether it proposes feasible mitigation measures for potential impacts to historical resources." The remainder of the letter sets forth Baloian's concerns.

Matthew Treber, a planner with County's resource management agency, signed a declaration dated June 18, 2009, that stated (1) he was responsible for compiling the administrative record and (2) the Baloian comment letter "is not in the County's files and was not considered because Applied Earthworks withdrew the letter within a few days of its receipt and requested that it be destroyed."

#### b. *Arguments and analysis*

Plaintiffs contend that the failure of County to include the Baloian comment letter in the final EIR and to address the substantive concerns raised in the letter violate the information disclosure provisions of CEQA and, therefore, constitute an abuse of discretion. Plaintiffs also contend that the removal of the letter from the files violated Government Code section 6200, which provides that every public officer having custody of any paper filed or deposited in any public office shall not willfully remove or destroy the whole or any part of such paper.

---

[11] Because defendants did not show the trial court erred when it determined the *Farm Bureau* decision and Jackson letter were part of the administrative record under subdivision (e) of section 21167.6, we need not address whether those documents also could have been admitted as extra-record evidence. Accordingly, we do not decide one of the issues left open in footnote 5 of *Western States, supra*, 9 Cal.4th at page 575—namely, whether the general rule excluding extra-record evidence in traditional mandamus proceedings is subject to an exception where the evidence is relevant to agency misconduct. (See *Barthelemy v. Chino Basin Mun. Water Dist., supra*, 38 Cal.App.4th at p. 1621 [existence of an " 'agency misconduct' " exception to general rule was arguable].)

Defendants argue, without citation to authority, that the letter was properly excluded from the administrative record because a "potential commenter can waive the right to comment, is not obligated to comment and can withdraw a comment." They also assert no prejudice occurred because the letter raised no issues not raised in the EIR, especially the comments made by the Dumna Tribal Council and County's responses to those comments.

The fundamental issue underlying the dispute over the Baloian comment letter is whether that letter was required to be part of the administrative record. Subdivision (e)(6) of section 21167.6 states that the administrative record shall include "[a]ll written comments received in response to, or in connection with, environmental documents prepared for the project . . . ."

For purposes of this appeal, we will assume that the Baloian comment letter should have been included in the administrative record[12] and will analyze only the question of prejudice.

We conclude that the exclusion of the Baloian comment letter from the administrative record does not constitute reversible error because its exclusion resulted in no prejudice to plaintiffs. (See pt. III.B. & C., *post* [County's treatment of archaeological resources and mitigation violated CEQA].) Stated otherwise, the outcome of this appeal would have been the same as the outcome reached had the Baloian comment letter never been written or had the letter been included in the administrative record.

6., 7.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II. *Standard of Review*

■ The acts of County's board of supervisors in (1) certifying the final EIR and (2) approving an ordinance that adopted the Tesoro Viejo specific plan and related rezoning constituted legislative and quasi-legislative decisions. In *Yost v. Thomas* (1984) 36 Cal.3d 561 [205 Cal.Rptr. 801, 685 P.2d 1152], the California Supreme Court stated that it had "no doubt" that "the adoption of a specific plan is to be characterized as a legislative act." (*Id.* at p. 570.) It also stated that "the rezoning of land is a legislative act . . . ." (*Ibid.*)

---

[12] By making this assumption, we avoid deciding a question of first impression: When a person submits a comment letter regarding a draft EIR and subsequently requests that the letter be withdrawn, does that letter constitute written comment for purposes of subdivision (e)(6) of section 21167.6 and thus qualify as part of the administrative record?

*See footnote, *ante*, page 48.

■ A petition for traditional mandamus is appropriate when the challenged action is legislative or quasi-legislative. (*Western States, supra*, 9 Cal.4th at p. 567.) Alternatively, a petition for a writ of administrative mandamus is appropriate when an adjudicatory or quasi-judicial decision is challenged. (*Id.* at pp. 566–567.) In this case, plaintiffs' petition for a writ of mandamus is properly classified as a petition for traditional mandamus (1) subject to the procedures set forth in Code of Civil Procedure section 1085 and (2) reviewed under the standards contained in Public Resources Code section 21168.5. (*Wagner Farms, Inc. v. Modesto Irrigation Dist., supra*, 145 Cal.App.4th at p. 772.) This conclusion is not controversial, as a vast majority of proceedings challenging agency action for violating CEQA are treated as traditional mandamus reviewed under section 21168.5. (*Wagner Farms, Inc., supra*, at p. 772; 2 Robie et al., Cal. Civil Practice: Environmental Litigation (2002) § 8:31 (rel. 4/2011).) Moreover, the parties agree that the prejudicial abuse of discretion standard contained in section 21168.5 applies to this case.

Pursuant to section 21168.5, an abuse of discretion is established "if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."

"An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo. [Citations.] We therefore resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates any legal error by the [agency] and whether it contains substantial evidence to support the [agency's] factual determinations." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 [53 Cal.Rptr.3d 821, 150 P.3d 709] (*Vineyard*).)

"Substantial evidence" is defined in the Guidelines as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).)

■ When the inquiry into legal error involves an EIR, the question can be phrased generally as "whether the EIR is sufficient as an information document." (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1391 [133 Cal.Rptr.2d 718].) When the specific claim of legal error concerns an omission of required information from the EIR, the plaintiff must demonstrate that (1) the EIR did not contain information required by law and (2) the omission precluded informed decisionmaking by

the lead agency or informed participation by the public. (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 987 [99 Cal.Rptr.3d 572].) These two elements constitute an abuse of discretion and prejudice, respectively, and together form reversible error. (See § 21005, subd. (a); *Association of Irritated Residents, supra*, at p. 1391 [noncompliance with CEQA's information disclosure requirements not per se reversible; prejudice must be shown].)

## III. *Archaeological Sites That Are Historical Resources*

### A. *Contents of EIR*

"Cultural Resources" are addressed in section 4.5 of the EIR. The discussion is based primarily on the Baloian Study. Subsection 4.5.1 of the EIR describes the project's environmental setting from a cultural resources perspective. It includes headings and text concerning (1) prehistoric context, (2) ethnographic setting, (3) historic setting, (4) identification of historical resources in the project site, (5) Native American consultation, and (6) paleontological resources.

The EIR states that the archaeological work reflected in the Baloian Study resulted in the recordation of four prehistoric-period sites and three historic-period sites and that the sites were evaluated under the criteria of the California Register of Historical Resources (California Register). EIR section 4.5's introduction summarizes its conclusions that the four prehistoric-period resources and one of the historic-period sites, the Madera Canal, are significant "historical resources" for purposes of CEQA.[13]

A description of each of the seven sites is set forth under the subheading "Identification of Historical Resources in the Project Site" in section 4.5.1 of the EIR. The prehistoric site designated CA-MAD-295/827 is a large village site near the San Joaquin River that contains bedrock milling stations, flaked and ground stone artifacts, animal bone, freshwater mussel shell, and human bone. The prehistoric site designated CA-MAD-826 is a large bedrock milling location near the San Joaquin River that might be associated with the Dumna village, I-ah'-pin.[14] The prehistoric site designated CA-MAD-2392 is a large site that includes adjacent knolls and the confluence of two seasonal drainages. It contains a sparse scatter of flaked and ground stone artifacts. The prehistoric site designated CA-MAD-2394 contains a number of milling stations, a chert quarry, a rock shelter with an intact midden, and a scatter of

---

[13] The definition of an "historical resource" for purposes of CEQA is too long to reproduce here. It can be found at Guidelines section 15064.5, subdivision (a).

[14] I-ah'-pin is the first Dumna village and is central to the Dumna's creation myth.

flaked and ground stone artifacts. It is the only chert quarry along the San Joaquin River that exhibits thermal spalling, a specific type of prehistoric stone reduction technique.

The EIR states that each of these sites is eligible for listing on the California Register; the Madera Canal, which is an element of the Central Valley Project, also is eligible; the other two sites evaluated, one of which contains an abandoned steel windmill and well, are not eligible for the California Register.

Subsection 4.5.3 of the EIR addresses project impacts and mitigation. The two paragraphs immediately preceding the discussion of impacts labeled as "Impact 4.5-1" through "Impact 4.5-9" state: "CEQA requires consideration of project impacts on either archaeological sites or historical sites deemed to be historical resources. If the project will cause a substantial adverse change to the characteristics of an historical resource that conveys its significance or justifies its eligibility for inclusion in the California Register, the project is judged to have a significant effect upon the environment, according to Section 15064.5 of the CEQA guidelines. Five of the seven resources in the Project Area are considered historical resources: CA-MAD-295/827, 826, 2392, 2394 and P-20-002308. In addition, there are areas that are of special religious or social significance to the Native Americans (e.g., Traditional Cultural Properties) in the Project Area. [¶] Based on the current project design, all historical resources and the sites of special religious or social significance within the Project Site may be impacted by the proposed development, either directly or indirectly." (Fn. omitted.)

Impact 4.5-1 concerns the project's effect on traditional cultural property. The four prehistoric sites considered historical resources are the subjects of Impacts 4.5-2 through 4.5-5. The historic-period resource, the Madera Canal, is addressed in Impact 4.5-6. Impacts 4.5-7 through 4.5-9 concern the potential impact on undiscovered buried prehistoric- or historic-period resources, paleontological resources not yet discovered, and human remains.

The wording used to describe the impact is the same for each of the four prehistoric sites: "Implementation of the Proposed Project may cause a substantial adverse change in the significance of an historical or archaeological resource identified as CA-MAD-[site number]. This is considered a potentially significant impact." (Boldface omitted.) In addition, the description of the impact for three of the four prehistoric sites states: "However, implementation of mitigation measures MM4.5-2(a) through MM4.5-2(e) would reduce this impact to a *less-than-significant* level." (Boldface omitted.) The statement regarding the impact to the large bedrock milling station, CA-MAD-826, parallels this language but references only mitigation measure MM4.5-2(a).

The five mitigation measures—MM4.5-2(a) through MM4.5-2(e)—address (a) verification, (b) the use of a data recovery plan, if recommended, (c) preservation in place, if approved by County, (d) protection of the sites during construction from vandalism or inadvertent direct contact, and (e) protection of the sites after construction is completed.

The verification mitigation measure contained in MM4.5-2(a) is controversial because it provides for a second determination of whether the site is an historical resource for purposes of CEQA. It provides in full: "Prior to the commencement of construction activities that could directly or indirectly impact CA-MAD-2394, the Project Applicant shall hire a qualified archaeologist to analyze the artifacts previously recovered in test excavations to verify the data potential and integrity of the site. If it is verified that the site is a historical resource for the purposes of CEQA the qualified archaeologist shall review all existing documentation and make recommendations as to the appropriate course of action. Appropriate actions could include a Data Recovery Plan or preservation in place. The County shall review and approve any course of action recommended by the archaeologist." (Italics omitted.)

### B. *"Verification" of an Historical Resource*

#### 1. *Contentions of the parties*

Plaintiffs argue that the verification procedure adopted in mitigation measure MM4.5-2(a) implicitly contradicts the EIR's conclusion that the four prehistoric sites are historical resources for purposes of CEQA.

A similar argument regarding the verification of the archaeological sites as "historical resources" for purposes of CEQA was raised in the Dumna Tribal Government's comment letter. The letter asserted that the mitigation measure requiring verification was unnecessary.[15] The final EIR responded to this comment by stating that Applied EarthWorks, Inc.'s "evaluation did not include standard post-field technological analyses, interpretations, and regional comparisons commonly used by archaeologists to support a determination that the archaeological site meets the CEQA criteria for a unique archaeological resource or a historical resource. Thus, the eligibility determination made by Applied Earthworks requires verification, which is provided for by mitigation measure MM4.5-2(a)."

On appeal, defendants' description of the verification process differs from that contained in the foregoing response to the Dumna Tribal Government's

---

[15] At oral argument, counsel for defendants asserted that plaintiffs had failed to exhaust their administrative remedies on all the issues they raised on appeal. We conclude that the letter's comment regarding verification was sufficient to present that issue at the administrative level and, thus, satisfies the exhaustion requirement in section 21177, subdivision (a).

comment. Here, defendants assert that the problem regarding verification is one of semantics and that, when properly interpreted, the approach set forth in the mitigation measures complies with CEQA.

Defendants interpret the term "verify" as used in the mitigation measure to mean further study and analysis and argue that further study is indicated because of the uncertainty surrounding the sites and their contents. The uncertainty includes the total size and precise resources of each site. To illustrate this uncertainty, defendants assert "there may be numerous objects or features within a large site which individually may constitute more or less significant historical resources, such as artifacts, human remains and natural features which have been modified or used by human beings . . . ." Defendants contend that the Baloian Study stated in some cases significant artifacts had been recovered and no more data recovery would be warranted and, in other cases, the Baloian Study "suggested that the significance of a feature would potentially warrant preservation in place if feasible while other resources would be subject to data recovery." This uncertainty, defendants contend, was recognized in the EIR, which "essentially came to the same conclusions [as the Baloian Study] and required further analysis [(i.e., verification)] as part of mitigation to determine degrees of significance for different resources and feasible mitigation in each case—either preservation in place or data recovery."

Plaintiffs reply that this verification procedure is not authorized by CEQA and that defendants' current description of that procedure has not been raised before this appeal and is a post hoc attempt to save an unlawful part of the EIR.

### 2. *Subsequent verification violates CEQA*

The threshold question in analyzing the mitigation measure in MM4.5-2(a) is to address the "semantic problems" referenced by defendants and determine what the mitigation measure means.

Defendants suggest (1) that the analysis to be performed by the qualified archaeologist will not reverse the EIR's determination that certain sites are "historical resources" for purposes of CEQA, but will make determinations regarding specific aspects of those sites, such as features and artifacts, and (2) that those specific determinations will be used in selecting appropriate mitigation.

We reject this interpretation of MM4.5-2(a) because it is contrary to the plain, unambiguous language used in that mitigation measure. The relevant language provides: "If it is verified *that the site* is a historical resource for the

purposes of CEQA . . . ." (Some italics omitted.) This language clearly states that the site, not just aspects contained within the site, will be subject to verification as a historical resource. Moreover, the final EIR's response to the Dumna Tribal Government's comments confirms this interpretation with its statement that "the eligibility determination made by Applied Earthworks requires verification . . . ."

Pursuant to our reading of the mitigation measures providing for verification, there are two possible results from the procedure. Either the site will be "verified" as an historical resource and the other mitigation measures listed for the resource will be applied, or it will be determined that the site is not an historical resource and the determination of historicity contained in the EIR will be undone.

■ We note that the verification process described in the mitigation measure is not expressly authorized by CEQA or the Guidelines. More broadly, neither CEQA nor the Guidelines authorize any mechanism or procedure for undoing an EIR's conclusion that an archaeological site is an historical resource. Neither, we believe, can such a process be harmonized with CEQA and the Guidelines.

The relevant provisions include Guidelines section 15064.5, subdivision (c)(1), which states: "When a project will impact an archaeological site, a lead agency shall first determine whether the site is an historical resource, as defined in subdivision (a)." In addition, another Guideline states: "Prior to approving a project the lead agency shall certify that: [¶] (1) The final EIR has been completed in compliance with CEQA . . . ." (Guidelines, § 15090, subd. (a)(1); see Pub. Resources Code, § 21151, subd. (a) [local agencies shall certify completion of the EIR].)

■ The use of the word "shall" in Guidelines section 15064.5, subdivision (c)(1) indicates that the determination whether an archaeological site is an historical resource is mandatory. (See *id.*, § 15005, subd. (a) ["shall" defined as mandatory].) Also, that provision's use of the word "first" and the guideline concerning the certification of EIR's lead to the conclusion that the determination must be made sometime before the final EIR is certified, and it cannot be undone after certification of the EIR. In other words, if the determination regarding historicity is subject to being undone, the EIR cannot be regarded as complete for purposes of CEQA.

■ Based on the foregoing, we conclude that the mitigation measure for the four prehistoric-period sites contained in MM4.5-2(a) sets forth a course of action that is contrary to law. The postcertification verification procedure allows for an environmental decision to be made outside an arena where

public officials are accountable. (*Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 96 [108 Cal.Rptr.3d 478].) Furthermore, the adoption of an unlawful mitigation measure means that County "has not proceeded in a manner required by law" for purposes of section 21168.5, and the writ of mandate issued should have directed County to remedy this error.

### C. *Feasible Mitigation and Preservation in Place*

#### 1. *General rules regarding the discussion of mitigation*

■ The most general of principles that affect an EIR's discussion of mitigation is the principle that an EIR is "an informational document." (§ 21061.) It is the policy of California that EIR's and other documents required by CEQA "be organized and written in a manner that will be meaningful and useful to decisionmakers and to the public." (§ 21003, subd. (b).)

Organizing and providing information in an EIR is guided in part by the requirement in section 21100 for detailed statements on certain matters. (§ 21061.) That section requires, among other things, that EIR's contain a detailed statement of (1) all significant effects on the environment of the proposed project, and (2) the mitigation measures proposed to minimize the significant environmental effects of the proposed project. (§ 21100, subd. (b)(1), (3).) The purpose of these detailed statements is to provide agencies and the public with "information about the effect which a proposed project is likely to have on the environment [and] list ways in which the significant effects of such a project might be minimized . . . ." (§ 21061.)

The detailed statements in an EIR need not be technically perfect to be legally sufficient. (Guidelines, § 15003, subd. (i).) Instead, they are reviewed for "adequacy, completeness, and a good-faith effort at full disclosure." (*Ibid.*)

Section 21100, subdivision (b)(3)'s requirement for a detailed statement of mitigation measures proposed is amplified by Guidelines section 15126.4. Subdivision (a) of that guideline sets forth the general rules for the discussion of mitigation measures; subdivision (b) sets forth the specific rules applicable to historical resources; and subdivision (b)(3) addresses the narrower topic of historical resources of an archaeological nature.

The following general rules from Guidelines section 15126.4, subdivision (a) are pertinent to the discussion of mitigation measures in this case.

First, the "EIR shall describe feasible measures which could minimize significant adverse impacts . . . ." (Guidelines, § 15126.4, subd. (a)(1).) Section 21061.1 defines "feasible" to mean "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors."

Second, the discussion of mitigation measures "shall identify mitigation measures for each significant environmental effect identified in the EIR." (Guidelines, § 15126.4, subd. (a)(1)(A).) This discussion shall distinguish between mitigation measures proposed by the project proponents and measures proposed by other persons. (*Ibid.*)

Third, if more than one mitigation measure is "available to mitigate an impact," the EIR should discuss each measure and identify the basis for selecting a particular measure. (Guidelines, § 15126.4, subd. (a)(1)(B).) The phrase "available to mitigate an impact" used in Guidelines section 15126.4, subdivision (a)(1)(B) means that the mitigation measure is feasible. Thus, reading the foregoing provisions together leads to the conclusion that the EIR must describe and discuss feasible mitigation measures for each significant environmental effect, provided feasible measures exist.

Fourth, the formulation of mitigation measures should not be deferred. (Guidelines, § 15126.4, subd. (a)(1)(B); see *Communities for a Better Environment v. City of Richmond, supra,* 184 Cal.App.4th at p. 95 [deferral of specification and adoption of mitigation measures concerning greenhouse gas emissions until a year after project approval violated CEQA].)

### 2. *Specific rules for historical resources of an archaeological nature*

Guidelines section 15126.4, subdivision (b) addresses mitigation measures related to impacts on historical resources. When the particular historical resource is archaeological in nature, the discussion contained in the EIR is governed by subdivision (b)(3) of that guideline, which provides in part:

"Public agencies should, whenever feasible, seek to avoid damaging effects on any historical resource of an archaeological nature. The following factors shall be considered and discussed in an EIR for a project involving such an archeological site:

"(A) Preservation in place is the preferred manner of mitigating impacts to archaeological sites. Preservation in place maintains the relationship between artifacts and the archaeological context. Preservation may also avoid conflict with religious or cultural values of groups associated with the site.

"(B) Preservation in place may be accomplished by, but is not limited to, the following:

"1. Planning construction to avoid archaeological sites;

"2. Incorporation of sites within parks, greenspace, or other open space;

"3. Covering the archaeological sites with a layer of chemically stable soil before building tennis courts, parking lots, or similar facilities on the site.

"4. Deeding the site into a permanent conservation easement.

"(C) When data recovery through excavation is the only feasible mitigation, a data recovery plan, which makes provision for adequately recovering the scientifically consequential information from and about the historical resource, shall be prepared and adopted prior to any excavation being undertaken. . . ."[16]

### 3. *Contentions of the parties*

The parties disagree on the interpretation as well as the application of Guidelines section 15126.4, subdivision (b)(3). Plaintiffs contend that the regulation requires the EIR to consider and discuss the feasibility of preservation in place and that "[d]ata recovery through excavation is appropriate only when it is determined that preservation in place is not feasible." In defendants' view, the regulation sets forth two approaches to mitigation of impacts on historical resources of an archaeological nature: "Preservation in place is the preferred manner for mitigating impacts on historical or archaeological sites, but data recovery is also permitted, especially where the interest is in the information to be obtained regarding history and prehistory. [Citation.]" Defendants further contend that the preference does not mean preservation in place is mandatory whenever feasible.

With respect to the application of Guidelines section 15126.4, subdivision (b)(3) to the facts of this case, plaintiffs assert the EIR is inadequate because it does not consider or discuss the feasibility of any means for accomplishing preservation in place and does not explain why preservation in

---

[16] These provisions apply to archaeological sites that are historical resources. Archaeological sites that are not historical resources are subject to different requirements. For example, when a site meets the definition of a unique archaeological resource and is not an historical resource, it is treated in accordance with the provisions in section 21083.2, not Guidelines section 15126.4, subdivision (b)(3). (Guidelines, § 15064.5, subd. (c)(3).) As a result, unique archaeological sites that are not historical resources are subject to less stringent requirements regarding mitigation of impacts.

place is not a feasible mitigation measure. In contrast, defendants contend the EIR is adequate because it discusses both preservation in place and data recovery. Defendants further contend plaintiffs have ignored the record, which includes mitigation measure MM4.5-2(c) and its discussion of preservation in place. The EIR, defendants assert, "thus identifies preservation in place as one of the two mitigation measures potentially available."

### 4. Interpretation of rules regarding an EIR's discussion of mitigation

The interpretation of the general and specific rules set forth earlier presents a question of law subject to independent review. (See *Manriquez v. Gourley* (2003) 105 Cal.App.4th 1227, 1234 [130 Cal.Rptr.2d 209] [construction of regulations, like construction of a statute, is a question of law].)

We agree with plaintiffs' contention that an EIR's discussion of mitigation measures for an impact to historical resources of an archaeological nature must include preservation in place. Defendants do not dispute this interpretation. The question is what must be included in the discussion.

■ In its introductory sentence to subparagraphs (A) through (D), Guidelines section 15126.4, subdivision (b)(3) states that "[t]he following factors shall be . . . discussed in an EIR . . . ." Subparagraph (A) mentions preservation in place, which is described as "the preferred manner of mitigating impacts to archaeological sites." Subparagraph (B) lists four methods of accomplishing preservation in place. Because the introductory sentence uses the word "shall," the discussion of the factors set forth in subparagraphs (A) through (D) is mandatory. (Guidelines, § 15005, subd. (a) ["shall" and "must" are mandatory].) Also, we interpret the word "factors" to include preservation in place generally as well as the four methods listed in Guidelines section 15126.4, subdivision (b)(3)(B). Therefore, the EIR's discussion of mitigation measures for impacts to historical resources of an archaeological nature must include preservation in place, and the discussion of preservation in place must include, but is not limited to, the four methods of preservation in place listed in subparagraph (B).

■ What must be included in an EIR's discussion of the factors referenced in Guidelines section 15126.4, subdivision (b)(3)? Because the regulation requires the factors to be discussed without regard to whether or not they are feasible, the discussion must state whether the factor is a feasible mitigation measure and the reasons for that determination. This interpretation is derived in part from the general requirement that EIR's describe feasible mitigation measures that could minimize significant adverse impacts. (Guidelines, § 15126.4, subd. (a)(1).)

Furthermore, when more than one of the factors referenced in Guidelines section 15126.4, subdivision (b)(3) is available to mitigate an impact, the EIR's discussion should include "the basis for selecting a particular measure." (*Id.*, subd. (a)(1)(B).) Also, the discussion must distinguish between those measures that are proposed by the project's proponents and those proposed by other persons. (*Id.*, subd. (a)(1)(A).)

### 5. *Preservation in place is not always mandatory when feasible*

The parties disagree about whether Guidelines section 15126.4, subdivision (b)(3) makes preservation in place mandatory when it is feasible. The dispute involves the following text: "Preservation in place is the preferred manner of mitigating impacts to archaeological sites." (*Id.*, subd. (b)(3)(A).) In addition, plaintiffs contend their position is supported by the use of the word "only" in the following provision: "When data recovery through excavation is the only feasible mitigation, a data recovery plan . . . shall be prepared . . . ." (*Id.*, subd. (b)(3)(C).)[17] The interpretation of the foregoing regulatory language has never been addressed in a published decision of a California appellate court.

■ In resolving this dispute over the proper interpretation of the regulation, we place the specific text in the context of the broader regulatory scheme created by the Guidelines. (*Anthony v. Snyder* (2004) 116 Cal.App.4th 643, 663 [10 Cal.Rptr.3d 505] ["regulatory scheme must be read as a whole"].)

To establish this context, we note that the term "prefer" or "preferred" is not defined elsewhere in the Guidelines. In contrast, the terms "shall," "must," "should" and "may" are defined to indicate whether a particular subject is mandatory, advisory, or permissive. (See Guidelines, § 15005.) The regulation's use of the term "preferred" when these other terms were available and defined strongly supports the inference that the term "preferred" was intended to mean something else. For instance, if the regulation was intended to make preservation in place mandatory, the word "must" or "shall" could have been used. (*Id.*, subd. (a).) Similarly, if the intent was that preservation in place be adopted "in the absence of compelling, countervailing considerations," the word "should" could have been used. (*Id.*, subd. (b).)

---

[17] Plaintiffs seem to approach the range of possible mitigation as though "preservation in place" and "data recovery through excavation" were the only two choices possible. We do not agree with such a reading of the Guidelines because, among other things, (1) preservation *in another place* might be possible and (2) data recovery might be achieved *without excavation*. As an example of preservation in another place, historical buildings about to be flooded by construction of a dam could be relocated to another site, such as occurred with the ancient temples along the Nile River when Egypt built the Aswan Dam in the 1960's.

Lastly, if the intent was that preservation in place be "left fully to the discretion of the public agencies involved," the word "may" could have been used. (*Id.*, subd. (c).)

Black's Law Dictionary (9th ed. 2009) defines "preferred" to mean "[p]ossessing . . . a priority or privilege." (*Id.* at p. 1298.) Unfortunately, this definition provides little help in our quest. Consequently, we have looked to other legal principles that are phrased in terms of a preference involving one substantive choice (as opposed to a choice of timing or sequence) over another. One such legal principle is California's version of the "parental preference doctrine." Under that doctrine, "[p]arents have a fundamental right to custody of their children. (*Santosky v. Kramer* [(1982)] 455 U.S. [745,] 753 [71 L.Ed.2d 599, 102 S.Ct. 1388].) Consistent with this right, the courts apply a 'parental preference doctrine' which provides that parents generally have the right to custody of their children over a third party. (*In re B.G.* (1974) 11 Cal.3d 679, 693–694 & fn. 23 [114 Cal.Rptr. 444, 523 P.2d 244].) However, this right is not absolute and must be balanced against a child's 'fundamental [or compelling] right . . . to "have a placement that is stable [and] permanent." ' (*In re Jasmon O.* (1994) 8 Cal.4th 398, 419 [33 Cal.Rptr.2d 85, 878 P.2d 1297] . . . .)" (*H.S. v. N.S.* (2009) 173 Cal.App.4th 1131, 1139 & fn. 11 [93 Cal.Rptr.3d 470].)

■ We will adopt a similar approach to construing the term "preferred manner." The preference is a general rule that applies unless, on balance, another type of mitigation better serves the interests protected by CEQA in general and by CEQA's provisions concerning archaeological and historical resources in particular. (See §§ 21000 [legislative findings], 21001 [legislative findings], 21083.2 [archaeological resources], 21084.1 [historical resources].) Stated otherwise, we interpret "preferred manner" to mean that feasible preservation in place must be adopted to mitigate impacts to historical resources of an archaeological nature unless the lead agency determines that another form of mitigation is available and provides superior mitigation of the impacts. Furthermore, we interpret the regulatory language that includes preservation in place among the factors that "shall be considered and discussed in an EIR" (Guidelines, § 15126.4, subd. (b)(3)) to mean that, when the preference is not followed, the EIR shall state why another type of mitigation serves the interests protected by CEQA better than preservation in place. We use the broad concept of "interests protected by CEQA" here because a particular historical resource of an archaeological nature may be of interest to the public in general and to particular groups for different reasons, and different types of mitigation may protect certain aspects of that resource better than other aspects. For example, the interests protected by capping or covering an archaeological site before building (§ 21083.2, subd. (b)(3)) are different from the interests protected by relocating the resource to another location.

### 6. *Inadequacy of EIR's discussion of mitigation measures*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### D., E.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. *Traffic*

### A. *Proper Baseline for Traffic*

Plaintiffs contend (1) that CEQA requires the use of the existing physical environment as a baseline for analyzing a project's impacts to traffic and (2) that the EIR here is inadequate because it instead uses predicted future conditions as a baseline. Two fundamental points are in dispute: what baseline or baselines did the EIR actually use to analyze traffic impacts, and did County have discretion to use conditions predicted to exist in the future? The latter question requires the interpretation of Guidelines section 15125 and certain provisions of CEQA.

### 1. *Meaning of relevant provisions of CEQA and Guidelines*

Our analysis of the requirements that govern the choice of a baseline begins by recognizing that, from the 1970 enactment of CEQA until 1998, "neither CEQA nor the Guidelines used the term 'baseline,' even though, as a conceptual matter, the determination of whether impacts are 'significant' requires a 'baseline' set of environmental conditions against which to compare a project's anticipated impacts." (Remy et al., Guide to CEQA: Cal. Environmental Quality Act (11th ed. 2007) p. 198 (Guide to CEQA).) In 1998, the Resources Agency amended Guidelines section 15125 to include the term "baseline," but CEQA itself still does not use or define the term. (Guide to CEQA, *supra*, at p. 199.) Guidelines section 15125, subdivision (a) provides: "An EIR must include a description of the physical environmental conditions in the vicinity of the project, *as they exist* at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and regional perspective. This environmental setting will *normally* constitute the *baseline* physical conditions by which a lead agency determines whether an impact is significant." (Italics added.)

---

[*]See footnote, *ante*, page 48.

Defendants interpret this regulatory language and the provisions of CEQA to provide flexibility in the choice of the baseline physical conditions used to analyze impacts so long as existing conditions are described in the EIR. They contend that use of the word "normally" in Guidelines section 15125, subdivision (a) implies agencies have discretion to formulate a different baseline. They further contend that the only limitation on this discretion is the requirement that substantial evidence support the choice of baseline.

 The proper interpretation of Guidelines section 15125, subdivision (a) requires an examination of what is implied by the use of the term "normally" as well as consideration of the meaning of the term "exist." The term "exist" is especially important because it was used by the Legislature in CEQA itself. (E.g., §§ 21060.5 ["environment" defined as the physical conditions that *exist* within the affected area], 21151, subd. (b) [when preparing an EIR, "any significant effect on the environment shall be limited to substantial, or potentially substantial, adverse changes in physical conditions which *exist* within the area" (italics added)].) A regulation must be "consistent and not in conflict with the statute" to be valid. (Gov. Code, § 11342.2.)

The proper interpretation of Guidelines section 15125, subdivision (a) was addressed recently by the Sixth Appellate District in *Sunnyvale West Neighborhood Assn. v. City of Sunnyvale City Council* (2010) 190 Cal.App.4th 1351 [119 Cal.Rptr.3d 481] (*Sunnyvale*) [use of traffic conditions projected for the year 2020 as the baseline was error].) The court there considered whether the word "normally," as used in Guidelines section 15125, subdivision (a), meant that a lead agency evaluating traffic impacts had the discretionary authority "to select the conditions on some future, postapproval date as the 'baseline' so long as it act[ed] reasonably as shown by substantial evidence." (*Sunnyvale, supra,* at p. 1379.) The court found no authority for such a proposition; indeed, it found such an interpretation would conflict with existing authorities and with the principle that administrative regulations cannot contravene the governing statute, which in the case of CEQA includes the requirement that the impact of any proposed project be evaluated based on the changes it might cause to *existing* environmental conditions. (*Sunnyvale, supra,* at pp. 1372–1380.)

Defendants assert the *Sunnyvale* decision went too far in limiting the lead agency's discretion. We, however, find the extensive analysis undertaken by the *Sunnyvale* court to be persuasive. That being the case, we will not set forth a redundant analysis here. (See 9 Witkin, Cal. Procedure, *supra,* Appeal, § 499, p. 560 [persuasive effect of decisions from other districts].)

 We adopt the following legal conclusions based on the precedent established by *Sunnyvale*: (a) A baseline used in an EIR must reflect existing

physical conditions; (b) lead agencies do not have the discretion to adopt a baseline that uses conditions predicted to occur on a date subsequent to the certification of the EIR; and (c) lead agencies do have the discretion to select a period or point in time for determining existing physical conditions other than the two points specified in subdivision (a) of Guidelines section 15125, so long as the period or point selected predates the certification of the EIR.

Our decision to follow *Sunnyvale* is consistent with the results of this court's three published decisions that refer to the concept of a CEQA baseline: (a) *Wal-Mart Stores, Inc. v. City of Turlock* (2006) 138 Cal.App.4th 273 [41 Cal.Rptr.3d 420] (*Wal-Mart Stores*), (b) *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645 [57 Cal.Rptr.3d 663] (*SJ Raptor Rescue*), and (c) *Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683 [58 Cal.Rptr.3d 102] (*Woodward Park*).

In *Wal-Mart Stores*, the City of Turlock enacted a zoning ordinance that prohibited so-called discount superstores in certain areas of the city and determined an EIR was not required for the ordinance because various CEQA exemptions applied. (*Wal-Mart Stores, supra*, 138 Cal.App.4th at pp. 278–279.) Wal-Mart challenged the ordinance, arguing that CEQA required further environmental review. (*Wal-Mart Stores*, at p. 278.) The trial court denied Wal-Mart's CEQA claim and we affirmed, concluding that further environmental review was unnecessary because the zoning ordinance was covered by a prior EIR for the city's general plan. (*Wal-Mart Stores*, at p. 279.)

The arguments presented caused us to consider the reasonably foreseeable indirect physical changes in the environment that might be caused by implementing the ordinance. (§ 21065 [definition of "project" references a "physical change in the environment"]; *Wal-Mart Stores, supra*, 138 Cal.App.4th at p. 288.) In evaluating these potential physical changes, we emphasized the importance of properly identifying the relevant *change*, which "is identified by comparing *existing* physical conditions with the physical conditions that are predicted to exist at a later point in time, after the proposed activity has been implemented. [Citation.] The difference between these two sets of physical conditions is the relevant physical change." (*Wal-Mart Stores*, at p. 289, fn. omitted.)

Wal-Mart's analysis of the physical change to the environment was based on a comparison of (a) a prediction of development that would occur if an ordinance banning discount superstores remained in effect with (b) a prediction of development that would occur without such an ordinance, which prediction included the construction of a new Wal-Mart superstore within the city's limits. We concluded this comparison of two predictions of future

conditions was legally erroneous because it failed to use existing conditions to determine the change resulting from the project. (*Wal-Mart Stores, supra*, 138 Cal.App.4th at p. 290.)

In *SJ Raptor Rescue, supra*, 149 Cal.App.4th 645, the project proponent obtained a conditional use permit and a certified EIR for an expansion of its aggregate mining operations. The plaintiffs alleged the EIR violated CEQA because it failed to accurately describe the environmental setting. (*SJ Raptor Rescue*, at p. 650.) We examined the EIR and concluded its description of the environmental setting was legally inadequate because it failed to clearly identify the baseline assumptions about the mining operations. (*Id.* at p. 659.) We stated that the baseline environmental setting "must be premised on realized physical conditions on the ground, as opposed to merely hypothetical conditions allowable under existing plans."[22] (*SJ Raptor Rescue, supra*, at p. 658.)

In *Woodward Park*, a developer proposed building a 477,000-square-foot office park and shopping center on a vacant lot. The existing zoning and plan designations allowed a 694,000-square-foot facility to be built there. (*Woodward Park, supra*, 150 Cal.App.4th at pp. 697–698.) The EIR, for the most part, compared the proposed project's impacts on traffic congestion and air pollution with the larger, hypothetical development allowed by the applicable zoning and plans rather than with the vacant lot or the existing physical situation. (*Id.* at pp. 707–708.) This court concluded that the "hypothetical office park was a legally incorrect baseline," that the EIR "failed to use the existing physical environment as the environmental baseline, and [that] none of the city's or [developer's] arguments show[ed] that any other baseline was permissible." (*Id.* at pp. 691, 711.)

Defendants rely on the following language from *Woodward Park* to support the view that lead agencies have the discretion to select a baseline using a prediction of future physical conditions rather than existing physical conditions: "The city makes an alternative argument that, even if it did not sufficiently analyze the project's impacts relative to existing physical conditions, it had discretion not to do so. The proposition that an agency sometimes can choose a baseline other than existing physical conditions is implicit in the Guideline's statement that existing physical conditions are 'normally' the baseline. Even so, in this case, neither the city nor [the developer] has advanced any reason why the normal approach was not required here." (*Woodward Park, supra*, 150 Cal.App.4th at p. 710.)

---

[22] This view of the law was quoted with approval by the California Supreme Court in *Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 321, footnote 6 [106 Cal.Rptr.3d 502, 226 P.3d 985].

The statement about what is implicit in Guidelines section 15125's use of the word "normally," however, is at most dicta stated for the sake of acknowledging the city's alternative argument. Thus, we do not regard the statement as precedent for the legal issue decided in this case.

In summary, this court's earlier discussions of the baseline concept lead us to agree with the *Sunnyvale* decision's interpretation of Guidelines section 15125 and the provisions of CEQA and its conclusions that (a) a baseline must reflect existing physical conditions and (b) lead agencies do not have the discretion to adopt a baseline that uses conditions predicted to occur on a date subsequent to the certification of the EIR.

### 2. What was the traffic baseline used in the EIR?

Application of the foregoing interpretation of Guidelines section 15125 to this case necessarily requires that we identify the traffic baseline used in the EIR. The parties read the EIR differently in this regard.

According to plaintiffs, the EIR failed to use the existing physical environment as its baseline for analyzing impacts to traffic. They support this position by referring to County's response to a comment included in the final EIR: "The only exception to the use of existing conditions as the environmental baseline is the traffic analysis. The traffic analysis considers cumulative (year 2025) without project conditions and compares it to cumulative (year 2025) with project conditions." In plaintiffs' view, the EIR's baseline traffic conditions should have been the negligible traffic generated in 2006 by the project area's vineyards, orchards, golf courses, and 49 large-lot residences.

In contrast, defendants read the EIR as using two baselines to analyze traffic impacts, and they assert existing conditions were the primary baseline.

Our inquiry into the traffic baseline used in the EIR begins with an overview of the part of the EIR that addresses the project's potential impact on traffic—namely, section 4.13, which is titled "Transportation/Traffic." That section is 63 pages long and is divided into five subsections: environmental setting (4.13.1), regulatory framework (4.13.2), project impacts and mitigation (4.13.3), cumulative impacts (4.13.4) and references (4.13.5).

The first of the two introductory paragraphs in EIR section 4.13 states that the section evaluates the potential of the project to result in impacts to traffic, including the potential "to increase local and regional traffic volumes, exceed a level of service (LOS) standard, [and] increase hazards due to a design feature . . . ." The next paragraph states that the data used in EIR section 4.13

.

came from an August 2007 transportation impact analysis report prepared for the project by Fehr & Peers (appen. H to the EIR). The report "evaluated three scenarios: Existing Traffic Conditions, Far-Term (Cumulative) *Baseline* Conditions (2025), and Far-Term (Cumulative) with Project Conditions (2025)."[23] (Italics added.)

"Baseline," as italicized in the foregoing quote, is one of three times the term appears in section 4.13 of the EIR. In addition, a reference to "the cumulative year (2025) baseline" occurs in the first paragraph of subsection 4.13.3 and a reference to "future baseline conditions" is made in subsection 4.13.4 on page 4.13-60 of the EIR. These three "baseline" references in EIR section 4.13 suggest, at a minimum, that there was a baseline that used future conditions.

Notwithstanding these references to a baseline that uses conditions forecast for the year 2025, defendants support their assertion that existing conditions were used as the primary baseline by pointing to the EIR subsection 4.13.1's detailed discussion of existing traffic conditions, which also is the first scenario evaluated in the Fehr & Peers traffic impact analysis report. For example, subsection 4.13.1 addresses the existing traffic volume and levels of service at 19 intersections in the project area. Table 4.13-5 sets forth the existing peak hour *levels of service* (both a.m. and p.m.) for each of these intersections. Figure 4.13-2 contains a diagram of each intersection and sets forth the *volume of traffic* traveling in each direction at the intersections. For example, the diagram of the intersection of State Route 41 and Road 204 (the east-west roadway that bisects the project) indicates that, during the peak a.m. hours, traffic on the northbound side of State Route 41 consists of 286 vehicles that continue north, six vehicles that turn left (west), and one vehicle that turns right (east) onto Road 204. The corresponding p.m. hour volumes are 957, 27, and 9, respectively.

Despite all of the information provided about 2007 traffic conditions in EIR subsection 4.13.1, that subsection does not explicitly state that existing conditions constitute a baseline. Furthermore, as subsection 4.13.1 is devoted to describing the environmental setting, it does not address any environmental impacts that might be caused by the project (impacts are covered in subsection 4.13.3). The absence of any discussion of environmental impacts in subsection 4.13.1 means it does not contain information from which we can deduce which baseline was used. Therefore, we must look elsewhere to determine which baseline the EIR actually used.

---

[23] The contents of the Fehr & Peers traffic impact analysis report, including the evaluation of these three scenarios, was based on the Guide for the Preparation of Traffic Impact Studies released by CalTrans in December 2002.

The most logical place to look for the baseline used is the part of the EIR that addresses the project's impacts, which here is subsection 4.13.3. Ordinarily, project impacts are determined by comparing the baseline conditions to the conditions that are anticipated during project construction and after it is completed. (Guide to CEQA, *supra*, at p. 199.) The difference between the anticipated conditions and the baseline conditions is the environmental change (i.e., impact) that the lead agency evaluates to determine whether a significant environmental effect will occur. (*Ibid.*) Certain statements contained in EIR subsection 4.13.3 lead the reader to expect this type of comparison—a comparison that would make it relatively easy to identify the baseline being used. For example, under the heading "Thresholds of Significance," subsection 4.13.3 provides:

". . . For the purposes of this EIR, implementation of the Proposed Project may have a significant adverse impact on transportation/traffic if it would result in any of the following:

". . . Cause an increase in traffic which is substantial in relation to the existing traffic load and capacity of the street system (i.e., result in a substantial increase in either the number of vehicle trips, the volume to capacity ratio on roads, or congestion at intersections)?

". . . Exceed, either individually or cumulatively, a LOS standard established by the county congestion management agency for designated roads or highways?"[24]

If the EIR had explicitly described this first type of impact analysis, one would have expected to see a comparison of the increase in traffic to "the existing traffic load and capacity" and a determination of whether that increase was substantial from the perspective of the number of vehicle trips. In that comparison, the "existing traffic load and capacity" would have been the baseline conditions. The EIR's traffic analysis, however, does not expressly identify any such increases.[25] Therefore, we do not have those numbers (or similar numbers) from which we can reverse-engineer the baseline used.

---

[24] We note that these two questions as well as others in EIR subsection 4.13.3 are taken directly from item XV in appendix G of the Guidelines. That appendix is an "Environmental Checklist Form" that may be used in determining whether a project could have a significant effect on the environment. (*Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 896, fn. 5 [124 Cal.Rptr.3d 755].) Although the level-of-service question is not discussed in this opinion, we have included it here because section 4.13 of the EIR discusses level of service (LOS) at length.

[25] To illustrate the type of increase that was not discussed in the EIR we again refer to the intersection of State Route 41 and Road 204. Figure 4.13-12 provides the cumulative (2025) peak hour traffic volumes predicted to occur with the project. According to information in

Despite the absence of the explicit calculations of increases in traffic volume and an analysis of whether any such increase was "substantial in relation to the existing traffic load," we recognize that the EIR made an attempt to compare existing conditions with projections of what traffic conditions would be in 2025 with and without the project. For example, figure 4.13-13 in the EIR provides the peak hour traffic volume (both a.m. and p.m.) for 20 segments of State Route 41 under three scenarios: the existing 2007 traffic, the predicted traffic in 2025 without the project, and the predicted traffic in 2025 with the project. Despite this side-by-side presentation of data, section 4.13 of the EIR does not (a) explicitly state that existing conditions were the traffic baseline or (b) include calculations that use figures representing existing conditions to calculate the relevant change.

Based on our review of the EIR's traffic analysis, the traffic impact analysis study attached to the EIR, and County's response to public comments, we are unable to state with certainty that existing conditions were used as the baseline for determining the significance of the project's potential impacts on traffic. At best, the EIR lacked clarity regarding which baseline or baselines were used. This lack of clarity is similar, but not identical, to the situation presented in *SJ Raptor Rescue, supra*, 149 Cal.App.4th 645, in which the EIR failed to accurately describe its baseline environmental setting. In *SJ Raptor Rescue*, we concluded that substantial evidence supported the county's use of 240,000 tons per year as a baseline of existing conditions at an aggregate mining operation that was seeking a conditional use permit for an expansion of operations. (*Id.* at p. 659.) The deficiency in the EIR was that it "d[id] not clearly identify the baseline assumptions regarding mine operations . . . ." (*Ibid.*) Furthermore, "although the four-year production average of 240,000 tons was apparently used in the impacts section(s) of the EIR, nowhere is that fact plainly stated. Such an omission clearly falls short of the requirement of a good faith effort at full disclosure." (*Ibid.*) In other words, the EIR did not present information in a manner calculated to reasonably inform the public and decision makers about the project, which contributed to its inadequacy as an informational document. (*Ibid.*)

In *SJ Raptor Rescue, supra*, 149 Cal.App.4th 645, we reversed the judgment and remanded to the trial court with directions to grant the writ of mandate. (*Id.* at p. 673.) We also directed that reapproval of the project could

figure 4.13-12's diagram of that intersection, the peak p.m. hour traffic volumes on the northbound side of State Route 41 will include 510 vehicles continuing north on State Route 41, 30 vehicles turning left (west), and 1,130 vehicles turning right (east) onto Road 204. The 2007 peak p.m. hour volumes were 957, 27, and 9, respectively. Section 4.13 of the EIR did not explicitly calculate the 1,121 vehicle per hour increase in the traffic turning right at this intersection or discuss whether that increase of 1,121 was substantial in relation to the 9 vehicles of existing traffic.

be considered if a legally adequate EIR was prepared, circulated, and certified in compliance with CEQA. (*SJ Raptor Rescue*, at p. 673.)

In this case, the EIR also fails to clearly identify the baseline that is being used to quantify the project's impacts on traffic. Prior to reapproval of the project, this deficiency must be cured.

 B. *Feasible Mitigation of Traffic Impacts**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

V. *Cumulative Impacts**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

VI. *Water Supply Assessment*

 A. *Background*

 1. *Statutory provisions*

 Section 21151.9 provides that, when a CEQA project exceeds certain statutory thresholds related to water demand, the lead agency "shall comply with Part 2.10 (commencing with Section 10910) of Division 6 of the Water Code."[30] Water Code section 10910 requires a city or county considering those projects to obtain a written assessment of water supply and demand and specifies the contents of the assessment. Water Code section 10911, subdivision (b) requires the city or county to include the water assessment document in the project EIR.

If, as occurred in this case, the city or county is able to identify a public water system that will supply water to the project, the public water system is to prepare the water assessment. (Wat. Code, § 10910; Guidelines, § 15155, subd. (b)(1).) The Tesoro Viejo Master Mutual Water Company is the public water system in this case, and it had a water supply assessment prepared. The amended water supply assessment dated July 2008 was attached to the final EIR as appendix J.

 2. *Trial court's determination*

The parties disputed whether the discussion contained in the water supply assessment was legally sufficient. The trial court concluded the discussion

---

*See footnote, *ante*, page 48.

[30] Part 2.10, "Water Supply Planning to Support Existing and Planned Future Uses," of division 6 of the Water Code contains sections 10910 through 10915.

was inadequate. Paragraph No. 4 of the judgment stated: ". . . County as lead agency abused its discretion by failing to proceed as required by CEQA, in that the Project EIR failed to disclose, discuss or analyze uncertainties surrounding the proposed use of Holding Contract No. 7 as the Project's source of water, and likewise failed to address alternative water sources which might supply water to the project if Holding Contract water were not available, as well as the environmental impacts of using such alternative sources."

In reaching its decision, the trial court relied on the California Supreme Court's decision in *Vineyard, supra,* 40 Cal.4th 412 and the Court of Appeal's decision in *California Oak Foundation v. City of Santa Clarita* (2005) 133 Cal.App.4th 1219 [35 Cal.Rptr.3d 434] (*California Oak*).

### 3. *Case law*

*California Oak* was decided 15 months before the California Supreme Court decided *Vineyard.* Therefore, we will address the *California Oak* decision first.

In *California Oak,* the plaintiffs challenged the certification of an EIR and the approval of an industrial development project by arguing, among other things, that the EIR's finding that sufficient water supplies existed for the project lacked sufficient evidentiary support. The trial court denied the plaintiffs' petition. (*California Oak, supra,* 133 Cal.App.4th at p. 1223.) The Court of Appeal reversed, concluding that substantial evidence did not support the finding that sufficient water supplies existed for the project. (*Id.* at p. 1226.)

The plaintiffs asserted that the EIR's analysis of water supply was inadequate because it relied, without discussion or analysis, on the Castaic Lake Water Agency's entitlement to 41,000 acre-feet of water per year from the State Water Project. (*California Oak, supra,* 133 Cal.App.4th at p. 1236.) Reliance on that particular water source was questionable because the EIR for Castaic Lake Water Agency's purchase of the entitlement had been decertified in *Friends of the Santa Clara River v. Castaic Lake Water Agency* (2002) 95 Cal.App.4th 1373 [116 Cal.Rptr.2d 54]. (*California Oak, supra,* at p. 1236.)

The court determined that the EIR's treatment of Castaic Lake Water Agency's 41,000 acre-feet of water per year entitlement was inadequate. (*California Oak, supra,* 133 Cal.App.4th at p. 1236.) The court summarized its conclusions as follows: "[N]o analysis was provided of the adequacy of the water supply in light of the uncertainty flowing from the decertification of the EIR for the Castaic purchase. This absence of discussion and analysis

undermines the informational function of the EIR for the Gate-King project and requires its decertification." (*California Oak, supra*, 133 Cal.App.4th at p. 1241.)

In *Vineyard*, the plaintiffs challenged the approval of a community plan and specific plan related to a large mixed-use development project. Among other things, the plaintiffs claimed the approval violated CEQA because the EIR failed to adequately identify and evaluate future water sources for the development. The superior court denied the claim and the Court of Appeal affirmed. (*Vineyard, supra*, 40 Cal.4th at p. 421.)

 The California Supreme Court granted review and addressed the following question: "[W]hat level of uncertainty regarding the availability of water supplies can be tolerated in an EIR for a land use plan[?]" (*Vineyard, supra*, 40 Cal.4th at p. 428.) As background for its discussion of this specific question, the court included a part of its opinion titled "*Principles Governing CEQA Analysis of Water Supply.*" (*Id.* at pp. 428–435.) In this part, the court discussed decisions of the Courts of Appeal that "specifically addressed the sufficiency of an EIR's analysis of future water supplies" (*id.* at p. 428) and identified "certain principles for analytical adequacy under CEQA" with which it agreed (*id.* at p. 430). The two principles pertinent to this appeal were stated as follows: "An EIR for a land use project must address the impacts of likely future water sources, and *the EIR's discussion must include a reasoned analysis of the circumstances affecting the likelihood of the water's availability.* (*California Oak, supra*, 133 Cal.App.4th at p. 1244.) [¶] Finally, where, despite a *full discussion*, it is impossible to confidently determine that anticipated future water sources will be available, CEQA requires some discussion of possible replacement sources or alternatives to use of the anticipated water, and of the environmental consequences of those contingencies. [Citation.]" (*Vineyard, supra*, 40 Cal.4th at p. 432, italics added & omitted.)

### 4. *Guidelines*

Less than six months after the *Vineyard* decision, the state Resources Agency issued Guidelines section 15155 to address city or county consultation with water agencies and water supply assessments.

 Subdivision (e) of Guidelines section 15155 reiterates the requirement that the lead agency shall include a water supply assessment in the EIR prepared for certain projects. (See Wat. Code, § 10911, subd. (b) [inclusion of water supply assessment in EIR].) The projects affected are "water-demand projects," a term defined in subdivision (a)(1) of Guidelines section 15155. Most of these definitions parallel the definitions of "project" contained in

subdivision (a) of Water Code section 10912. For example, both terms include a residential development of more than 500 dwelling units. (Wat. Code, § 10912, subd. (a)(1); Guidelines, § 15155, subd. (a)(1)(A).)

The second half of subdivision (e) of Guidelines section 15155 identifies what the lead agency must do after the disclosure of information has been made: "The city or county lead agency shall determine, based on the entire record, whether projected water supplies will be sufficient to satisfy the demands of the project, in addition to existing and planned future uses. If a city or county lead agency determines that water supplies will not be sufficient, the city or county lead agency shall include that determination in its findings for the water-demand project."

### 5. *Discussion in the EIR and Appendix J*

Section 4.14.1 of the EIR states that all existing onsite water demands are met with surface water delivered from the San Joaquin River under a contract with the United States Bureau of Reclamation known as "Holding Contract No. 7." It also states that current onsite agricultural use of water for irrigation averages about 3,000 acre-feet per year.

The EIR estimates the proposed project's average water demand at full buildout at 4,810 acre-feet per year. The EIR states that Holding Contract No. 7 "provides a reliable surface water source for the Project Site" and that the project applicant and the Tesoro Viejo Master Mutual Water Company have agreed to limit withdrawals to 3,150 acre-feet per year plus certain adjustments. The difference between this withdrawal and the water demand at full buildout will be supplied from reclaimed water.

Appendix J to the final EIR, the amended water supply assessment, contains an executive summary, 30 pages of text divided into 12 sections, and six attachments, which include Holding Contract No. 7 and the opinion letter of Professor Joseph L. Sax regarding legal issues concerning water supply entitlements under Holding Contract No. 7.

Article 7 of Holding Contract No. 7 provides that the United States will not "object to any reasonable beneficial use of the water of the [San Joaquin] River for irrigation and/or domestic purposes exclusively upon the land described in Exhibit A . . . ."

The Sax opinion letter states his views that (a) the project's proposed water uses fall within the meaning of the "irrigation and/or domestic purposes" language used in Holding Contract No. 7 and (b) the holding contract includes "contractual water entitlements and rights adequate to meet demands

for water associated with the project during normal, single dry, and multiple dry (including critical dry) water years during a 20-year period, subject to force majeure as provided in the holding contract." The Sax opinion letter explains the nature of the contract holder's rights under the contract as follows: "22. From time to time various parties have stated that the holding contract (or others like it) does not establish water rights under state law in the contracting owners and that such rights remain to be established. The first statement is correct but the second is not. It is certainly true that the holding contract does not, and could not, establish a water right under state law. As to the second statement, however, whatever water rights the contracting owners had in the San Joaquin River were taken by the United States and compensated for by the holding contract. The contracting owners no longer have any water rights in the San Joaquin River. What the contracting owners have are the rights they are contractually entitled to exercise, and that the United States is contractually bound to recognize, in the use of San Joaquin River water that the United States controls pursuant to its prior acquisitions and exchanges and its permit from the State Water Resources Control Board. Inasmuch as the United States owns the rights to all the water reaching Friant Dam, it would appear that any question under California law about the appropriate use of San Joaquin River water would be referable to the United States and, where jurisdiction exists, to the terms of its permit from the State Water Resources Control Board. In this regard, it is notable that pursuant to paragraph 12 of the holding contract the United States is assigned the right to enforce and protect all water rights of both parties, whether derivative of the contract or otherwise."

### B. *Contentions of the Parties*

Defendants contend that the trial court erred by (1) improperly admitting and relying upon extra-record evidence and (2) applying the wrong standard of review. They contend the proper standard of review is the substantial evidence test rather than the compliance with law test used by the trial court.

Defendants also argue that "CEQA only requires compliance with the [water supply assessment] Law and adoption of findings as to the adequacy of water supplies (Guidelines, § 15155, subd. (e)) and any significant adverse impacts on water resources. (Guidelines, § 15126.)" Finally, they assert that the EIR (1) discussed the legal controversy over the project's dependence on Holding Contract No. 7 in the water supply assessment included in the EIR as appendix J and (2) contained the public comments presenting contrary views as well as County's responses to those comments. Based on these assertions, defendants conclude: "The only question is whether the entire Record provided substantial evidence to support the County's key factual findings and conclusions regarding the impacts of the Project on water resources per *Vineyard* and *California Oak*."

In contrast, plaintiffs contend that the de novo standard of review applies to whether the EIR fails to provide information mandated by CEQA.

## C. *Analysis*

### 1. *Claim of evidentiary error*

Defendants' claim that the trial court erred by admitting and relying upon extra-record evidence was rejected in part I.D.2. to 4., *ante*. Based on our conclusion that the trial court did not err when it included the *Farm Bureau* decision, the Jackson letter, and the two pages of the June 9, 2009, transcript in the administrative record, we will treat those documents as part of the administrative record in conducting our review.

### 2. *Standard of review*

In part II., *ante*, we discussed the standards of review that are applied in a CEQA matter. The appropriate standard of review depends on whether the reviewing court is addressing a legal or factual question. In *Vineyard*, the California Supreme Court stated: "We therefore resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates any legal error by the County and whether it contains substantial evidence to support the County's factual determinations." (*Vineyard, supra,* 40 Cal.4th at p. 427.) This statement clearly identifies the different standards of review that apply to legal and factual questions.

Consequently, our choice of the proper standard of review depends upon identifying correctly whether the question concerning the adequacy of the EIR's disclosures about the project's water supply is a question of law or a question of fact. Recently, the Court of Appeal addressed these two types of questions in the context of the adequacy of an EIR's disclosures: " 'An EIR will be found legally inadequate—and subject to independent review for procedural error—where it omits information that is both required by CEQA and necessary to informed discussion.' But CEQA challenges concerning the amount or type of information contained in the EIR [or] the scope of the analysis . . . are factual determinations reviewed for substantial evidence." (*Santa Monica Baykeeper v. City of Malibu* (2011) 193 Cal.App.4th 1538, 1546 [124 Cal.Rptr.3d 382], quoting *California Native Plant Society v. City of Santa Cruz, supra,* 177 Cal.App.4th at p. 986.)

Under these principles, when a plaintiff asserts error based on the omission of information, independent review will apply if the information in question is required by CEQA and necessary to informed discussion. In contrast, if the

asserted error concerns the amount or type of information that is not required by CEQA and necessary for an informed discussion, then the substantial evidence standard applies.

 In *Association of Irritated Residents v. County of Madera, supra,* 107 Cal.App.4th 1383, this court stated that many of the disputes presented centered "on the question whether relevant information was omitted from the FEIR." (*Id.* at p. 1391.) In addressing the standard of review, we stated: "[T]he existence of substantial evidence supporting the agency's ultimate decision on a disputed issue is not relevant when one is assessing a violation of the information disclosure provisions of CEQA." (*Id.* at p. 1392.) Although that opinion did not use the distinction between questions of law and questions of fact in its discussion, we effectively determined that compliance with CEQA's information disclosure requirements presented a question of law, not a question of fact. (See *Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1236–1237 [32 Cal.Rptr.2d 19, 876 P.2d 505] [omission of information from timber harvest plan treated as failure to proceed as required by law].) We adopt the same conclusion here. Thus, whether an EIR is sufficient as an informational document is a question of law subject to independent review by the courts.[31] (Guidelines, § 15003, subd. (i).) More specifically, the question concerning whether the EIR's disclosures regarding the project's water supply complies with CEQA is a question of law.

The foregoing conclusions lead us to reject defendants' argument that the only question presented regarding the water supply assessment is whether substantial evidence supports County's determination that the project had an adequate water supply.

### 3. *Information disclosure requirements concerning water supply*

The next question we address concerns identifying the rules of law that specify the information about a project's water supply that must be disclosed in the EIR. In this case, we are particularly concerned with the disclosure of information related to the reliability or availability of water from the project's intended source, Holding Contract No. 7.

 In *Vineyard,* the California Supreme Court addressed a different question, namely, "what level of uncertainty regarding the availability of

---

[31] In a CEQA proceeding, the public agency acts as the trier of fact and the superior court and appellate court review the agency's actions to determine whether the agency proceeded in the manner required by law and had sufficient evidence to support its findings. (*County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544, 1577–1578 [27 Cal.Rptr.3d 28]; *Stanislaus Natural Heritage Project v. County of Stanislaus* (1996) 48 Cal.App.4th 182, 192 [55 Cal.Rptr.2d 625].) Thus, on appeal, the appellate court's task is the same as that of the superior court, and the superior court's determinations are not binding on, or given deference by, the appellate court.

water supplies can be tolerated in an EIR for a land use plan." (*Vineyard, supra*, 40 Cal.4th at p. 428.) In addressing that question, however, the court identified a principle of analytical adequacy that we believe applies in this case. Specifically, "the EIR's discussion must include a reasoned analysis of the circumstances affecting the likelihood of the water's availability." (*Id.* at p. 432.) The next sentence of the opinion states: "Finally, where, despite a *full discussion*, it is impossible to confidently determine that anticipated future water sources will be available, CEQA requires some discussion of possible replacement sources or alternatives to use of the anticipated water, and of the environmental consequences of those contingencies." (*Ibid.*, italics added.)

It appears that our Supreme Court's use of the term "full discussion" refers back to the "reasoned analysis" mentioned in the prior sentence of the opinion. Also, the term "full discussion" is similar to the term "full disclosure" that appears in the general principle set forth in Guidelines section 15003, subdivision (i). That provision states that EIR's are reviewed for "adequacy, completeness, and a good-faith effort at *full disclosure*." (*Ibid.*, italics added.) Further insight into the "reasoned analysis" or "full discussion" requirement is provided later in *Vineyard* when the Supreme Court addresses the EIR's discussion of how the available water supply would meet the project's long-term water demand: "Instead of itself providing an *analytically complete and coherent explanation*, the FEIR notes that a full analysis of the planned conjunctive [(ground and surface water)] use program must await environmental review of the Water Agency's zone 40 master plan update, which was pending at the time the FEIR was released." (*Vineyard, supra*, 40 Cal.4th at p. 440, italics added.) The court regarded this approach as a legally improper attempt to tier from a future environmental document. It stated the lead agency could not avoid a "full discussion" of the likely water sources for the project by referring to an incomplete analysis in a master plan update. (*Id.* at pp. 440–441.) From this analysis, it appears the Supreme Court regards a discussion as "full" if it is an "analytically complete and coherent explanation." (*Id.* at p. 440.)

Based on the foregoing, we conclude that the legal adequacy of the EIR's discussion of the water supply for the Tesoro Viejo project depends upon whether the discussion included a reasoned analysis of the circumstances affecting the likelihood of the availability of water under Holding Contract No. 7. (*Vineyard, supra*, 40 Cal.4th at p. 432.) The "reasoned analysis" requirement can be rephrased as a "full discussion," a "good-faith effort at full disclosure,"[32] or an "analytically complete and coherent explanation."

---

[32] Subdivision (i) of Guidelines section 15003. Typically, when appellate courts see a good or bad faith standard, the question that springs immediately to mind is whether that standard is objective (based on reasonableness), subjective (based on the actor's state of mind or motives), or a combination of the two. (E.g., *Smith v. Selma Community Hospital* (2010) 188 Cal.App.4th

### 4. *Application of the reasoned analysis requirement*

Ultimately, this case comes down to whether the discussion in the EIR regarding the project's water supply is adequate despite the nondisclosure of information concerning uncertainties surrounding the proposed use of Holding Contract No. 7 as the project's source of water. The undisclosed information included (a) the position stated by an official of the Bureau of Reclamation in the Jackson letter and (b) the holdings in the *Farm Bureau* decision.

The Jackson letter states that the Bureau of Reclamation "would object to use of water diverted under a Holding Contract for development leading to a municipal supply or for commercial uses. A change in purposes of use of water specified under a Holding Contract from irrigation and/or domestic to include municipal and/or commercial uses would necessitate a contract amendment."

The Sax opinion letter conflicts with statements in the Jackson letter. In Professor Sax's view, Holding Contract No. 7's reference to any reasonable beneficial use of water for irrigation or domestic purposes would be interpreted to include the use of water for municipal, mining, milling, industrial, and other like purposes. Based on this interpretation, Professor Sax stated his opinion that the holding contract provided an existing water supply entitlement within the meaning of Water Code section 10910, subdivision (d).

▮ Although the opinion letter of Professor Sax counters the view set forth in the Jackson letter, neither the opinion letter nor the water supply assessment acknowledges the existence of the Jackson letter. We, like the trial court, conclude that the failure to mention the Jackson letter or the position of the Bureau of Reclamation set forth in that letter resulted in the public and decision makers being deprived of a full disclosure of the uncertainties related to the project's water supply. The basis for this conclusion is relatively simple. Would two objectively reasonable persons—one presented with only the water supply assessment and the other presented with both the water supply assessment and the Jackson letter—come to the same conclusion as to the level of uncertainty of the project's water supply? We conclude that they would not and, thus, the water supply assessment did not provide a full

---

1, 34 [115 Cal.Rptr.3d 416] [bad faith is ambiguous term]; *Brasher's Cascade Auto Auction v. Valley Auto Sales & Leasing* (2004) 119 Cal.App.4th 1038, 1054 [15 Cal.Rptr.3d 70] [particular good faith requirement in Cal. U. Com. Code interpreted as subjective standard in majority of jurisdictions and objective standard in minority of jurisdictions].) Because this good faith requirement is associated with the Supreme Court's use of the term "reasoned analysis," we conclude that an objective standard (reasonableness) of good faith applies in this case.

disclosure of relevant information. In short, omitting or ignoring contrary information is not the way to produce an adequate informational document.

Similarly, we conclude that the failure to discuss the existence of the *Farm Bureau* decision deprived the public of a full disclosure of the uncertainties related to the project's water supply.

The *Farm Bureau* decision concerned County's certification of an EIR for a development located near the San Joaquin River known as the River Ranch Estates Project. County's planning commission had voted to deny the application of the project based on, among other things, the lack of sufficient information to ensure that water would be available for the project. Despite this recommendation, the board of supervisors certified the final EIR and approved the entitlements for the River Ranch Estates Project. The superior court determined the water supply assessment for that project violated the Water Code and CEQA on the ground, among others, that substantial evidence did not support the position that reclamation holding contracts provide diversion rights independent of state water rights.

Although the Sax opinion letter addressed water entitlements under Holding Contract No. 7, neither the water supply assessment nor the text of the EIR informed the reader of the results of the *Farm Bureau* decision and explained why that result would not affect the Tesoro Viejo project's supply of water under Holding Contract No. 7. Consequently, the public was not provided a full disclosure of the uncertainties related to the project's water supply.

Therefore, we conclude that the trial court did not err in concluding that the EIR's discussion of the water supply was inadequate under CEQA.

VII. *Recirculation**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

VIII. *Order Taxing Costs*

A. *Background*

In November 2009, plaintiffs filed a memorandum of costs and defendants filed a motion to tax. At the hearing, the trial court determined that, pursuant to Code of Civil Procedure section 1032, subdivision (a)(4), plaintiffs were not entitled to costs as a matter of right. The court, therefore, had discretion

---

*See footnote, *ante*, page 48.

to allow and apportion costs between the parties. Noting that "in many ways the defendants prevailed; in many ways the plaintiffs prevailed," the court divided plaintiffs' costs equally between plaintiffs and defendants and ordered defendants to remit $5,725.86 to plaintiffs.

## B. *Statutory Provisions*

Plaintiffs' challenge to the trial court's decision to apportion costs between the litigants involves provisions for the award of costs contained in Code of Civil Procedure section 1032 and the concept of a prevailing party.

■ Code of Civil Procedure section 1032, subdivision (b) states that "a prevailing party is entitled as a matter of right to recover costs in any action or proceeding" except as otherwise expressly provided by statute. Code of Civil Procedure section 1032, subdivision (a)(4) defines "prevailing party" for purposes of the costs statute and contains an exception to the rule that a prevailing party is entitled to recover costs as a matter of right. The relevant part of that provision states: "When any party recovers other than monetary relief and in situations other than as specified, the 'prevailing party' shall be as determined by the court, and under those circumstances, the court, in its discretion, may allow costs or not and, if allowed may apportion costs between the parties on the same or adverse sides pursuant to rules adopted under [Code of Civil Procedure] Section 1034."[33]

In this case, plaintiffs obtained no monetary recovery, but did achieve "other than monetary relief" through the issuance of a peremptory writ of mandate decertifying the EIR and vacating the approvals related to the project. The absence of monetary relief and the plain terms of Code of Civil Procedure section 1032, subdivision (a)(4) required the trial court to determine who was the prevailing party. Furthermore, the plain terms of the statute also granted the trial court the discretion to apportion costs once the court determined that plaintiffs were the prevailing parties.

■ Based on the foregoing statutory analysis, we conclude that the trial court correctly determined it had the discretionary authority under Code of Civil Procedure section 1032, subdivision (a)(4) to apportion costs. In other words, when a plaintiff obtains a writ of mandate in a CEQA proceeding, that nonmonetary relief alone does not entitle the plaintiff to costs as a matter of right under Code of Civil Procedure section 1032, subdivision (b).

---

[33] The first and only other sentence of Code of Civil Procedure section 1032, subdivision (a)(4) that is not relevant to defendants' motion to tax costs provides: " 'Prevailing party' includes the party with a net monetary recovery, a defendant in whose favor a dismissal is entered, a defendant where neither plaintiff nor defendant obtains any relief, and a defendant as against those plaintiffs who do not recover any relief against that defendant."

Our conclusion regarding the discretionary authority of the trial court is compatible with the result in *Bowman v. City of Berkeley* (2005) 131 Cal.App.4th 173 [31 Cal.Rptr.3d 447]. In that case, the plaintiffs sought a writ of mandate to overturn the approval of a housing project for senior citizens on various grounds, including a claim that their due process rights were violated by the failure to provide a fair hearing before the project was approved. (*Id.* at pp. 175–176.) Plaintiffs obtained a writ vacating the project's approval and requiring a new hearing. After the hearing, the city council approved the project again, the matter was returned to the trial court, and the trial court denied the remaining challenges. (*Id.* at p. 176.) The plaintiffs sought attorney fees and costs. The trial court awarded less than 20 percent of the attorney fees requested and awarded $979 of the $5,761.37 in costs claimed. (*Ibid.*)

The appellate court affirmed the trial court's decision regarding the award of attorney fees under Code of Civil Procedure section 1021.5. (*Bowman v. City of Berkeley, supra,* 131 Cal.App.4th at pp. 177–182.) It concluded that the plaintiffs were successful parties for causing the initial writ to issue, despite the subsequent failure on their other causes of action. (*Id.* at p. 179.) In addition, the appellate court affirmed the award of costs, rejecting the argument that the plaintiffs could not be regarded as prevailing parties on the same grounds that it rejected the argument that the plaintiffs were not successful parties for purposes of the attorney fees statute. (*Id.* at p. 183.) Although the two-sentence discussion of costs did not reference Code of Civil Procedure section 1032, the court's use of the statutory term "prevailing party" implies that provision was the basis for upholding the trial court's apportionment of costs.

In this appeal, we need not proceed to the question whether the trial court abused its discretion in the way it apportioned plaintiffs' costs. The circumstances that served as the basis for that apportionment have changed by virtue of the greater success plaintiffs have achieved in this appeal. Because we cannot determine whether this greater success would have affected the trial court's discretionary apportionment of costs, we will (1) vacate the portion of the trial court's December 21, 2009, order that contains the 50 percent apportionment and sets plaintiffs' recovery at $5,725.86 and (2) remand to the trial court for it to exercise its discretion while taking into account how circumstances have changed as a result of this appeal.

## DISPOSITION

The October 26, 2009, judgment is affirmed in part and reversed in part. Paragraphs Nos. 1 through 4 and 6 through 9 of the judgment are affirmed. Paragraph No. 5 of the judgment is reversed and vacated. On remand, the

superior court is directed to enter judgment and grant the petition for writ of mandate as to the issues of (1) mitigation measures relating to archaeological sites, (2) the discussion of impacts to the environment consisting of traditional cultural property, (3) the EIR's analysis of traffic, which includes a failure to clearly indentify the baseline used in analyzing the project's impacts, and (4) the EIR's discussion of cumulative impacts.

Paragraphs Nos. 3 and 4 of the superior court's December 21, 2009, order taxing costs shall be vacated and the trial court is directed to exercise its discretion pursuant to Code of Civil Procedure section 1032, subdivision (a)(4) regarding the apportionment of costs in light of the changes resulting from this decision. Plaintiffs shall recover their costs on appeal.

Cornell, Acting P. J., and Gomes, J., concurred.